Argued and submitted November 18, 2019, reversed and remanded May 19, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JAIME FERNANDO RODRIGUEZ-AQUINO,
*Defendant-Appellant.*

Marion County Circuit Court
16CR05833, 15CR15783;
A164462 (Control), A164464

489 P3d 1060

Defendant appeals a judgment of conviction of one count of first-degree criminal mistreatment, ORS 163.205, one count first-degree assault, ORS 163.185, and two counts of fourth-degree assault, ORS 163.160. He raises three assignments of error, arguing, among other things, that the trial court erred when it denied his motion to exclude certain incriminating statements he made to the police, which he alleges were the product of unlawful inducement in violation of ORS 136.425(1) and Article I, section 12, of the Oregon Constitution. *Held*: The trial court erred in failing to suppress defendant's confession. Based on the officers' statements in this case, the state did not meet its burden to establish, by a preponderance of the evidence, that defendant's confession was not the product of an unlawful inducement. The burden of proof was not on defendant to prove that his will was overborne by the inducement held out by the state; confessions are presumptively involuntary, and the burden is on the state to overcome that presumption—which it did not do.

Reversed and remanded.

Lindsay R. Partridge, Judge.

Sara F. Werboff, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

JAMES, J.

Reversed and remanded.

**JAMES, J.**

In this consolidated criminal appeal, defendant appeals from judgments of conviction for one count of fourth-degree assault, ORS 163.160, as a lesser-included offense of first-degree criminal mistreatment, ORS 163.205, fourth-degree assault constituting domestic violence, ORS 163.160, and one count of harassment, ORS 166.065, raising three assignments of error. We reject without discussion his second and third assignments and write only to address defendant's first assignment of error wherein he contends that the trial court erred when it denied his motion to exclude certain incriminating statements he made to the police, which he alleges were the product of unlawful inducement in violation of ORS 136.425(1) and Article I, section 12, of the Oregon Constitution. We reverse and remand.

Whether a confession was the product of an unlawful inducement is a question of law, reviewed for errors of law. *State v. Terry*, 333 Or 163, 171, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002). The trial court's findings of fact are binding on review if there is evidence in the record to support the findings. *Id.* Here, the facts are not in dispute, particularly as the entire interrogation that is relevant to our analysis was recorded with video and audio. Because we reject defendant's second and third assignments of error, we address only facts pertaining to defendant's first assignment of error below.

Defendant is an immigrant from Guatemala, and English is his third language. He lives in an apartment with his wife, R, and their two sons, O and L. At the time of the underlying incident, O was approximately 15 months old, and L was 32 days old. Defendant and his wife have a history of physical confrontation. In April 2015, the couple got into a fight that led to defendant being charged with misdemeanor strangulation, which was dismissed, and with misdemeanor harassment, to which he pled guilty.

In January 2016, R confronted defendant one evening after he came home late from work. Defendant grabbed R's jaw forcefully with his left hand and slapped her with his right hand. R suffered bruises that lasted into the next morning, and R photographed them on her phone; those

photos were later found by the police. Later that same month, defendant and R had a loud argument. The next day, R woke up "certain that [she] wanted to leave" defendant, although she had told defendant that she wanted to leave him on about 20 occasions before that day. The family had planned to attend defendant's immigration check-in, but R changed her mind and decided to take the children to her parents' house in Corvallis. After defendant pleaded with her, R eventually changed her mind about leaving, because she "felt bad for him and wanted to work on [their] marriage, just like all the other times." She invited defendant to go to Corvallis with her.

R began packing, nursed L, and asked defendant to change L's diaper because it was soiled—with urine, but not with feces, as she later testified. L was crying and fussy when R handed him off to defendant. R left the room briefly to get L's clothes. Upon returning, she saw defendant with a worried look, kneeling beside the bed where L was lying with his upper body still clothed in a onesie and his lower body exposed with the onesie snapped away from the waist and a clean diaper underneath him. Defendant asked R to check L because he thought he had hurt the infant. Defendant told R that he heard a "popping sound." R checked L's legs and noticed that he cried more when she touched his thigh and knee area on his left leg. R said that as his mother, she could recognize L's crying patterns, and that during this time he was giving a cry she had never heard before, "a slow kind of wailing cry." R concluded that L was in pain and arranged to take him to the doctor. R asked defendant to elaborate on what had happened, and defendant initially said that "he kind of lifted the leg up and he just heard a pop" and then told her that he "twisted" it. R was in hysterics and crying with worry, and when she asked defendant to elaborate on how he might have hurt L, defendant could give no more information.

The family reported to the emergency room, where an x-ray revealed that L had a full femur break and a metaphyseal tibial fracture—which is caused by "a side-to-side shearing type of injury" consistent with a jerking or twisting motion. The doctor concluded that it was an injury that such an infant could not sustain by themselves, not even

from a fall; he concluded it was the result of nonaccidental trauma. The doctor also testified that he would not expect to see this type of injury if someone were to gently move an infant's leg, but rather the injury was consistent with force in the twisting of the leg. The injury was suspicious for child abuse, which initiated a mandatory report to child services, after which a pediatrician and child abuse specialist also confirmed the medical diagnoses of "child physical abuse." A patrol officer and a detective, Avetisyan, arrived at the hospital in response to the report. Because defendant had an outstanding arrest warrant for an unrelated offense, the detective transported him to a police station and took him into custody to interrogate him about his son's injured leg.

Avetisyan took defendant to an interview room with recording devices and fully advised defendant of his *Miranda* rights before questioning; defendant said that he understood his rights and agreed to talk. He was provided with bathroom access, water, coffee, and granola bars. At no time during the interview did he ask to terminate the questioning.

In the interview, defendant told Avetisyan that he primarily cared for O, while R primarily took care of L because L was nursing. He expressed how much he loved R and how sad he was because L was injured. Avetisyan asked defendant to demonstrate on a teddy bear how he had changed L's diaper. Defendant demonstrated how he had lifted L by the leg when he was wiping his buttocks and heard a "pop." Defendant said that he thought he may have lifted and turned the baby's leg too much by accident because L had been wiggling during the diaper change.

Avetisyan asked defendant whether he was arguing with R that morning, and defendant responded that he and R were getting along that morning. The detective asked defendant whether he was angry that R asked him to change L's diaper, which defendant denied. Asked if he "maybe jerk[ed] the leg a little bit" too hard, defendant again explained that L was "wiggling" during the diaper change and he lifted L's leg to steady him and wipe his buttocks. Avetisyan told defendant there are "millions of parents out

there who change diapers *** every day" and "it's a pretty rare thing for a kid's bone to break *** in the process." The detective asked if defendant was "scared" to tell him if he had dropped the baby or let the baby fall off the bed, and defendant denied that he had done so.

Avetisyan again left the room and returned accompanied by Lieutenant Nelson. Avetisyan told defendant that police would be inspecting defendant's apartment "to make sure things are just the way you describe them," and that R would probably meet defendant there with the child welfare agents. Defendant signed a consent-to-search form. Nelson told defendant, "[w]e're going to try to work through this tonight and get everything resolved" and that "the most important thing for you to do is to be completely honest and *** up front and open about everything," and that "we can usually work through certain things *** [b]ut one thing that will hurt anybody in *** a situation like this is if they withhold something." He said, "we just want to find the truth and we'll work with you on that and *** get down to the bottom of it as soon as we can." Nelson told defendant that he appreciated his cooperation and left the room.

After giving defendant a granola bar, Avetisyan asked defendant about drug and alcohol use and again asked defendant about marital problems with R. The detective told defendant that

"[T]he most important thing in this situation *** especially when a healthy little kid breaks his leg, [is that] we're completely honest with each other, you know what I mean? *** If there's a little detail that you're not telling me about *** that you are concerned it might get you in trouble somehow, eventually, the completely full truth will come out, you know what I mean? And that's—that's when it makes the person look bad that they did not disclose that from the very beginning. *** I mean, it's life and stuff happens, you know? And then people kind of freak out and then they're worried[.] *** [I]f there's something that was a little different from what you told me *** it's important to tell me now *** because, eventually *** we'll find out anyway. *** I'm not saying you're a liar. *** [S]ometimes people change the story just a little bit because they're scared. *** We're all humans, right?"

Avetisyan reiterated to defendant that he needed to be honest because he would be providing his report to the district attorney.

Defendant said that the more he thought about it, the more details were coming back to him about the incident. He explained that it was his first time changing L's diaper and that he was used to changing his older son who "moves really strong." He also said that he pulled L back by the leg so that he would not get feces on the bed, and the detective replied that that explanation "[made] more sense." He told defendant, "[s]ounds like you have a good heart. You just made a mistake." The detective again asked whether defendant was frustrated because R asked him to change L's diaper, which defendant again denied. Avetisyan told defendant, "I want to help you, you know, because you guys are a young couple, two little kids *** not very experienced with, you know, raising kids and stuff *** so I want to *** make sure that everybody comes out of this situation looking their best[.]" He explained, "if you made a mistake today, the best thing you can do for you and for your wife and for your kids is be honest about it *** and take responsibility for it." He then suggested that defendant might benefit from parenting classes, which defendant agreed would benefit him.

After a break, Nelson then returned and said that he had gone to defendant's apartment and spoken with his neighbors and with R, and that he had "the complete picture," saying "I'm 100-percent confident I got the truth from her." He went on to tell defendant, "I'm here because I truly care. I care about you, I care about your kid and I care about your wife. We all make mistakes in life. *** We want to help families. That's why we're here, 'cause we want to help." Nelson emphasized that "the difference between a good person and a really, really bad person" was that "a good person, once they realize they need to be honest and take responsibility, takes responsibility," whereas a "bad person" will "lie about it. They keep lying about it. And that tells me that person, like, no one should give them any leniency or any type of help." He told defendant that he was there to give him "one shot" to tell him the truth and asked him to be "straight up."

Nelson began to ask defendant why he had changed his story instead of telling them the "straight facts" the first time they asked him about the diaper change at the hospital. Defendant responded that he was initially very scared for L, that he "couldn't explain to the doctor," and that he just wanted the doctor to take care of L. He admitted being upset when he changed L's diaper and that he "snapped." Nelson told him, "I can't have you leaving here *** in a provable lie on me 'cause *** everything you've said, no one will ever believe." Defendant then admitted that he was angry and aggressive with L when he broke L's leg. Nelson asked defendant why he snapped, indicating that he did not believe defendant, and discussed giving defendant a polygraph. Nelson again emphasized that he was providing defendant an opportunity to tell the truth and telling him that if he was "withholding information" or "minimizing," *i.e.*, "not telling the whole truth about a certain situation" and "kind of downplaying it" that "it's not going to be good for [defendant]" but would hurt him "in the long run," and that the officers did not want defendant "to get in more trouble." Nelson pointed out to defendant that the facts he was giving the officers were "completely out of order," and defendant responded that he did not understand "that much English." Nelson asked if the story would change if the defendant was given a polygraph test, emphasizing, "[Y]ou have to be honest with me. *** I know it's hard, okay? I know it's hard. And every time you tell me, I can see in your eyes. I see in your eyes what you're not telling me."

Defendant said he wasn't "thinking right" when he hurt L, but that was "just blank and did it," stating, "I think it was this evil in me that I had there at that moment and the evil got me." He admitted that he was mad at L for wiggling and mad at R for asking him to change the diaper. He also admitted to having a "little bit" of an anger problem—at least with R—and to taking the anger out on L, and he started crying.

Asked if he was scared that he might do something similar in the future, defendant responded, "No, because I'm working on that. I'm going to church and I'm trying to calm—work my anger out." The officers asked what kind

of help defendant needed and if domestic violence or anger management classes would help him, and defendant said that they would. Defendant said, "I need help for real, man. \*\*\* I want to do this. Please help me. I don't want to go to jail[.]" He said that he did not want to "continue this" and that he would stay away from L until he learned to control himself, stating, "I'd prefer him to stay away from me because I don't want to hurt nobody and I need to control myself. I don't know myself and control my anger and stuff[.]" When he continued to ask for help, the officers responded that the only thing that would help defendant is him telling them "the absolute truth tonight" and that "[i]f there is anything that he withheld, it is going to haunt [him] and [he would] regret it." They also responded that they were law enforcement officers and the courts are "the ones that would require you to attend those classes if they deem it is necessary for you," advising him to request them after he's arrested.

Defendant told them, "I'm a bad person and I need help, please. I don't want to be doing bad stuff like that. \*\*\* I don't like to hurt nobody." The officers responded that he would "be held responsible for it" and "required to get help." They said that their goal in the justice system was not to "throw somebody in a cell and not take care of their problems," but rather "to hold people responsible and also get them the help they need so when they get back out in the community, they have tools to deal with the problems that they had." The officers said that this "help" was sometimes "counseling or talking to a doctor, taking medication[,] \*\*\* [g]etting education, things like that," and that they wanted "to make sure that [defendant would] thrive in the community." They then explained that a patrol officer was coming in to take defendant for booking, reminding defendant to be honest with the judge and about the fact that he needed help and was willing to change. Avetisyan said, "You want to do the right thing for your family in the future, but you need help to get there." The interrogation lasted from approximately 8:00 p.m. when he was brought into the interview room to approximately 1:00 a.m.

At trial, defendant moved to suppress evidence of his admissions during the interview, arguing that, under

Article I, section 12, defendant's statements were the product of unlawful inducements and therefore involuntary, focusing the trial court's attention to several statements throughout the interrogation where he claimed that the detectives made promises of leniency. The trial court denied the motion, noting: "The officer certainly expressed an opinion to the defendant about what his best course of action may be, but I don't view that as police overreaching." Defendant was tried by a jury and found guilty of fourth-degree assault as a lesser included offense of first-degree criminal mistreatment, fourth-degree assault constituting domestic violence, and acquitted of first-degree assault and fourth-degree assault constituting domestic violence.

On appeal, defendant maintains firstly that his confession was involuntary as a matter of law because it was induced by promises of "help" in lieu of prosecution, and that even if the detectives' promises of leniency were, on their own, insufficient to render defendant's confession involuntary, the circumstances of defendant's interrogation also rendered his confession involuntary. The state responds that the trial court properly admitted the statements, because they were not induced by threats or promises and were not otherwise involuntary.

A defendant's privilege against self-incrimination is described in Article I, section 12, and echoed in ORS 136.425(1), which states that "[a] confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats." The statute's purpose is "to exclude potentially false—and thus unreliable—confessions from evidence." *State v. Powell*, 352 Or 210, 222, 282 P3d 845 (2012).

Confessions are presumptively involuntary; the state has the burden to overcome that presumption by offering evidence affirmatively establishing, by a preponderance of the evidence, that the confession was voluntary. *See Powell*, 352 Or at 225-26. Though there is not a bright-line rule for evaluating whether the state has met that burden, it is "helpful to begin with the issue of whether the officers who interrogated defendant *induced* him to make admissions by

the influence of hope or fear." *State v. Jackson*, 364 Or 1, 22, 430 P3d 1067 (2018) (emphasis added).

The Oregon Supreme Court has recognized a distinction between permissible "mere adjuration" and impermissible "adjuration accompanied by inducement." *State v. Linn*, 179 Or 499, 510, 173 P2d 305 (1946). The former is a statement imploring a defendant to tell the truth or that it would be better to tell the truth, and is not sufficient for "inducement"; the latter is a statement that goes further— one "calculated to induce a confession of guilt." *Id.* at 510.

In this case, defendant argues that the officers' discussions of "help" amounted to promises of leniency. A promise of leniency need not be express, but may be implied. *State v. Pollard*, 132 Or App 538, 544, 888 P2d 1054, *rev den*, 321 Or 138 (1995). The precise wording of the officer's statement is not dispositive. It is sufficient if the words convey to a defendant "the idea of temporal benefit or disadvantage, and his confession follows in consequence of the hopes thereby excited." *State v. Wintzingerode*, 9 Or 153, 163 (1881).

"[T]he question whether a confession was unlawfully induced involves a highly fact-specific inquiry." *State v. Pryor*, 309 Or App 12, 20, 481 P3d 340 (2021). In this case, we highlight below statements by the officers during the course of the interrogation that stand out as potentially problematic:

- "I will tell you it's going to look bad for you, though, later on if you're not [truthful]. No one will ever believe you after this point tonight."

- "You gotta understand the criminal justice system, okay? I'm here today to give you an opportunity, you understand me? I'm here to give you that opportunity to say, 'Listen. This is exactly what happened and I'm sorry for the mistakes I made.'

  "But if you sit here tonight and not tell me the truth; and, later on, the prosecutor and the judge and everyone else gets all of this evidence, the statement from everybody, including [R], and all the physical evidence and they look at all that and then they look at your— what you told me tonight, what are they going to do? What do you think they'll do?"

"* * * * *

- "Jaime, look at me. Look at me. I've interviewed hundreds of people sitting in your chair, all right? We always find the truth and help that person. I will always help that person out. I cannot be more sincere than I am right now to you."

- "We have the truth and I don't want you to look bad. I'm serious. I don't want you to look bad. We all make mistakes in life. I've made my own mistakes. And I told you from the beginning that good people take responsibility for their mistakes. The bad people talk in circles and lie.

  "* * * * *

  "I want to help you. Do you believe me? * * * [L]ook in my eyes. Do you believe me that I want to help you? I do. I don't want to see you make a mistake tonight 'cause if you make a mistake, there's no turning back.

  "I cannot have you in a provable lie. I can't have you leaving here * * * in a provable lie on me 'cause if you leave here in a provable lie, everything you've said, no one will ever believe."

- "[W]e can usually work through certain things, * * * [b]ut one thing that will hurt anybody in a * * * situation like this is if they withhold something."

- "'Cause * * * what I'm trying to say is, you know, as a young family and everything, I want to make sure that, when this case is all done and everything * * * the people who are going to be involved in it, which—and I'm talking to you, you know, [Officer] Nelson's going to talk to your wife. And [the Department of Human Services] is obviously involved because when—any time there's an injury to * * * a kid, you know, they have to come out and see what it—what's going and what the living arrangements are and stuff to make sure the parents are caring for the kids, you know, and everything.

  "And then we—when we write our reports, we have to submit it to the District Attorney's Office * * * for them to review. And I want to make sure that you guys

get the help you need *** if there is something like that going on.”

- “I mean *** if you did something *** that caused something that shouldn’t have happened, then you’re not viewed as a criminal *** who, like, pulled a *** kid’s leg so far that he just broke it, you know, intentionally; that people understand that this was an accident.”

- “I want to help you, you know, because you guys are a young couple, two little kids *** not very experienced with, you know, raising kids and stuff *** so I want to *** make sure that everybody comes out of this situation looking their best[.]”

- “I appreciate you being honest ‘cause *** like I said, you know, whatever—when we do the reports are being *** reviewed and everything, we want to make sure that you guys, as a young family, get the help you need.”

- “[DETECTIVE]: I don’t want to view you as a criminal who hurt his kid on purpose. *** I just want to make sure you guys—if you need maybe to take a parenting class or two, whatever, you know. We’re—you know (indiscernible) that kind of thing, you know what I mean?

  “[DEFENDANT]: Yeah.

  “[DETECTIVE]: Do you think that would benefit you?

  “[DEFENDANT]: Yeah, that would benefit me.”

- “[T]he difference between a good person and a really, really bad person is a good person, once they realize they need to be honest and take responsibility, takes responsibility. *** I’m telling you, really, really bad people, you know what they do to me? They lie about it. They keep lying about it. And that tells me that person, like, no one should give them any leniency or—or any type of help[.]”

Police interrogations are, by their nature, encounters where law enforcement is attempting to build a rapport with a suspect. Accordingly, there are times when both a carrot, and a stick, are used. At points officers may offer sympathy, or try to bond with a suspect, at other points officers may intend the suspect to be nervous, fearful, or anxious. As the *Jackson* court observed,

> "it is the work of detectives to solve crimes, and it may take the application of pressure to secure a voluntary confession. We do not suggest that the use of the Reid technique or other strategies to obtain information from a suspect is necessarily coercive or will always require the exclusion of inculpatory statements. The question * * * is not whether a particular interrogation method was used, but whether, considering the totality of the circumstances, the suspect's will was overborne."

364 Or at 31.

Nevertheless, when an officer holds out the specter of help or assistance to a suspect during an interrogation, that officer is treading a potentially risky path. In *Jackson*, the Supreme Court observed three "themes" in the interrogation in that case: (1) helping the victims' families; (2) relieving the defendant's psychological or spiritual burden of having committed the crimes; and (3) describing the legal ramifications of the defendant's failure to confess. *Id.* at 24-25. The court held that the first two were not the sort of themes that have implicated unlawful inducements in the past, but that the same could not be said of the detectives' statements concerning the legal ramifications of the defendant's failure to confess. *Id.* at 25. When officers hold out a promise of help or state that "things will go better" for a suspect if they confess, they are entering that third, potentially problematic, category discussed in *Jackson*.

On multiple occasions, either we or the Supreme Court, have determined that such offers of help constituted an unlawful inducement. In *Linn*, the Supreme Court concluded that a confession was the product of an unlawful inducement after an officer told the defendant that he was "in a tough spot," that another man involved in a similar offense had been sentenced to seven years in prison, that it was the defendant's "best bet" to admit the crime and "throw himself on the leniency of the Court," and that the officer "felt he would get a better deal if he walked in and pled guilty." 179 Or at 504-06, 513.

In *Pollard*, we held that the defendant's confession was the product of an unlawful inducement when it was secured by implied promises of treatment in lieu of

prosecution. 132 Or App at 540. In that case, the defendant's son was hospitalized with severe injuries consistent with "shaken baby syndrome," and later died from those injuries. *Id*. A detective interrogated the defendant in a 40-minute, noncustodial interview before his son succumbed to his injuries. *Id*. at 544. During the interrogation, the detective told the defendant, "[Y]ou're going to have to be up front with me or I can't help you." *Id*. at 545 (emphasis omitted). The detective told the defendant "[L]et's get it over with. Let's get it done, get it up front and get on with your life and put your family back together." *Id*. (emphasis omitted). He continued,

> "[L]ike I say, if something happened and you want to get this thing up front and get it taken care of, I can help you in that respect. *Because I can tell you, you know, that if you don't, they'll just take it to a grand jury. That's what we will do.*"

*Id*. at 546 (emphasis in original). Also, the detective told the defendant, "This is what I'm trying to tell you, is you know, I can help you with that, but you've got to be totally honest with me." *Id*. at 547 (emphasis in original).

The trial court had found that there was an explicit promise of treatment. We concluded that the statement contained an implicit promise of treatment in lieu of prosecution:

> "[S]tatements made *before* defendant's son died—make sense only if [the detective] was promising treatment of defendant's abusive propensities *in lieu* of prosecution. * * * That accords with the ostensibly sympathetic, 'these things happen' tenor of the parties' conversation in which the detective professed to empathize, man-to-man, with defendant's situation and repeatedly purported to be interested in 'helping' him."

*Id*. at 548 (citation omitted).

In *State v. Hogeland*, 285 Or App 108, 109, 395 P3d 960 (2017), as in *Pollard*, we held that the defendant was induced to confess by promises of assistance. There, the defendant was interrogated in the police station by two detectives. One of the detectives said, "'[T]he crime has already been established'" and that the defendant "needed to tell him the honest truth." *Id*. (brackets in original; internal quotation marks omitted). He continued, "[W]as it an

accident, or was it on purpose, because if it's on purpose, I'll tell you right now, \*\*\* that is bad. That's something I need to strongly look into \*\*\* and you will not only have the chance of having your baby taken out of your life forever, but you will also be looking at a long time [in jail]." *Id*. (brackets omitted; emphasis omitted). The detective also said to the defendant that if he admitted that he had injured his son accidentally, he was "going to be able to see [his] child someday, \*\*\* and it's going to be soon," adding, "But don't you think you need the help?" *Id*. at 111. An hour into the interview, the defendant admitted that he had shaken his son and "need[ed] help." *Id*. at 112 (brackets in original).

We held that the defendant's confession was involuntary because the detective's "interrogation tactics conveyed an implicit promise that he would receive treatment rather than punishment if he admitted to hurting his son." *Id*. at 115. The detective had conveyed to the defendant that if he admitted to "accidentally" injuring his son "the repercussions would be far less severe" and a person in that situation would get "help" from the state. *Id*. We concluded,

> "[T]he quid pro quo underlying [the detective's] questions and statements—admit to what you have done and things will go better for you—would have been apparent to any person in defendant's position. That is, by explicitly tying treatment to an acknowledged need for help, [the detective] signaled to defendant that the possibility of receiving treatment and avoiding severe consequences depended wholly on his willingness to admit that he had accidentally injured his son."

*Id*. at 117.

Based on the officers' statements in this case, in light of *Jackson*, *Linn*, *Pollard*, and *Hogeland*, here, the state did not meet its burden to establish, by a preponderance of the evidence, that defendant's confession was not the product of an unlawful inducement—specifically, the promise of "help," which, in context, cannot reasonably be understood as anything other than help with his legal problems. The officers here repeatedly invoked the district attorney and DHS, and intimated, if not outright stated, that systemic help in the form of parenting classes would be contingent

on defendant's honesty as reflected in the police reports. Further, those parenting classes were held out as an alternative to something more severe. That alternative was vague and unspecified, but nonetheless present. According to the officers, defendant could be seen "as a criminal who hurt his kid on purpose," or, in the alternative, could be honest and, "take a parenting class or two." Finally, the officers indicated that dishonesty would mean that "no one" which can only be contextually understood to mean the prosecutor or judge, "should give them any leniency or any type of help."

  This is a close case. But ultimately, we conclude that the statements here communicated to defendant the idea that there would be a temporal benefit to confessing. The officer made it explicitly clear to defendant that he considered the truth to be that defendant injured his infant in a fit of anger:

> "Listen. I know—I know these things, okay? I know what the answer is before I ask you the question. Do you get what I'm trying to do? I'm trying to evaluate—you know what that word means, 'evaluate'? *** It means I'm trying to make sure you're telling me the truth. I know the answer, but I'm asking you the question to—to see if you're telling me the truth."

Then the officer communicated that there would be "no turning back" if defendant were to continue maintaining a "provable lie," but that "we can usually work through certain things" if he would be forthcoming. The detective stated, "I want to help you, you know, because you guys are a young couple, two little kids *** not very experienced with, you know, raising kids and stuff *** so I want to *** make sure that everybody comes out of this situation looking their best[.]"

  The detective then communicated that such "help" would be accomplished through what he included in his report, which he tied to what happens with the district attorney and DHS. The detective explained that "DHS is obviously involved" when there is an injury to a child. Immediately after explaining his desire to help defendant and his family and referring to DHS's involvement, he stated, "And then we—when we write our reports, we have to submit it to the District Attorney's Office *** for them to review. *And I want*

*to make sure that you guys get the help you need if* \* \* \* *there is something like that going on.*" (Emphasis added.)

Read in context, the detective indicated that he could influence DHS's involvement and the type of help defendant's family would receive through his report to the district attorney. And then, compounding that implication, the detective suggested that DHS involvement might be an alternative path to prosecution. The detective reiterated the role of his report in getting families help—"like I said, you know, whatever—when we do the reports are being reviewed and everything, we want to make sure that you guys, as a young family, get the help you need." He then quickly tied that to not wanting to view defendant "as a criminal who hurt his kid on purpose," and introduced the possibility of parenting classes.

Later, in the same exchange in which he referred to "leniency," the detective again reiterated that he was there "to help families":

> "[T]he difference between a good person and a really, really bad person is a good person, once they realize they need to be honest and take responsibility, takes responsibility. \* \* \* [whereas] really, really bad people \* \* \* [will] lie about it. They keep lying about it. And that tells me that person, like, no one should *give them any leniency* \* \* \* *or any type of help*[.]
>
> "We want to help families. That's why we're here, 'cause we want to help."

(Emphasis added.) The obvious implication from that comment is that the detective was in a position to influence the leniency or help that families might get.

In *State v. Simmons*, we noted that the hope offered by an officer's statements might be "thin," but can nevertheless give rise to an unlawful influence sufficient to render the confession involuntary. 302 Or App 133, 138, 460 P3d 521 (2020). That is the case here. The officers held out a thin hope that defendant might avoid the full weight of the state's prosecution and instead receive "leniency"—perhaps in the form of DHS involvement and parenting classes in lieu of prosecution—if he were to confess.

Our decision here is a product of the burden of proof. We emphasize, once again, that the burden is not on defendant to prove that his will was overborne by the inducement held out by the interrogator; confessions are presumptively involuntary, and the burden is on the state to overcome that presumption. *State v. Vasquez-Santiago,* 301 Or App 90, 106, 456 P3d 270 (2019). In approaching this record, we begin with a presumptively involuntary and unlawful confession. We then ask whether, on this record, the state has met its burden to overcome that presumption by demonstrating, by a preponderance of the evidence, that the confession was *not* the product of an inducement, or otherwise involuntary. Ambiguities or uncertainties in the record cut against the state, not the defendant. *Hogeland*, 285 Or App at 116 ("As the party with the burden of proving that defendant's statements were voluntary, the state bears the consequence of that ambiguity."). As we previously indicated, this is a close case. But we cannot say, on this record, that the state has carried its burden to overcome the presumption of an unlawful confession.

Finally, we conclude that defendant's ultimate confession followed from the unlawful inducements—a point not in contention. Likewise, we conclude that the admission of defendant's statements was harmful—again, a point not in contention. Accordingly, the trial court erred in failing to suppress defendant's confession.

Reversed and remanded.