Argued and submitted December 22, 2021, affirmed November 16, 2022, petition for review denied March 9, 2023 (370 Or 822)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MITCHEL JAMES DIDLOT,
*Defendant-Appellant.*

Lane County Circuit Court
18CR48893; A171537

521 P3d 159

Defendant appeals from a judgment of conviction for one count of first-degree rape and one count of first-degree sexual abuse. Defendant assigns error to the trial court's denial of his motion to suppress statements he made during a police interview, which he alleges were the product of unlawful inducements. *Held*: The detective's statements did not offer a benefit in exchange for defendant's confession and did not constitute unlawful inducements. In light of the totality of the circumstances of the interrogation, the statements by defendant were made voluntarily. The trial court did not err in denying the motion to suppress.

Affirmed.

Valeri L. Love, Judge.

Anne Kimiko Fujita Munsey, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Lauren P. Robertson, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Affirmed.

**SHORR, J.**

Defendant, who was convicted of one count of first-degree rape and one count of first-degree sexual abuse after a stipulated facts trial before the court, appeals from the judgment of conviction. In his sole assignment of error, defendant asserts that the trial court erred in denying his motion to exclude statements that he made during a police interview, which he alleges were the product of unlawful inducement in violation of ORS 136.425(1) and Article I, section 12, of the Oregon Constitution. We conclude that defendant's statements were made voluntarily, and the trial court did not err in denying his motion. Therefore, we affirm.

We state the facts in accordance with the trial court's findings of fact as supplemented by the record.[1] The facts are undisputed for purposes of appeal.

A report of abuse of the victim, defendant's five-year-old daughter, was made sometime in July 2018. On July 17, 2018, Detective Murray of the Springfield Police Department was assigned to investigate, and he witnessed a forensic interview of the child. The following day, Murray telephoned defendant and asked if he would come to the police station to speak with him. Before he called defendant, it was his understanding that the child's mother had already called defendant and confronted him about the alleged abuse.[2] Defendant agreed to come to the police department to speak with Murray.

On July 20, defendant and his then fiancée went to the police station around noon. Murray met defendant and defendant's fiancée in the department lobby. Murray was dressed in plain clothes with a firearm and handcuffs on his belt. Murray spoke to defendant's fiancée before he spoke with defendant. Regarding the interview itself, which was video recorded and lasted approximately one hour and

---

[1] After taking the matter under advisement, the trial court issued a written order denying defendant's motion to exclude certain statements and admissions. The order contains findings of fact and conclusions of law.

[2] Prior to defendant's arrest, the child would spend time with her mother in Salem and her father in Springfield.

35 minutes,[3] the trial court found, in its written order,[4] as follows:

> "At approximately 12:26 p.m. Detective Murray began his interview with Defendant. The interview took place in an interview room. Detective Murray did not make any promises or threats to the defendant before entering the interview room. Prior to the interview, Detective Murray did not notice any signs of impairment or cognitive defect on the part of the defendant. In reviewing the video, the Court notes that the defendant followed the conversation with ease and did not exhibit any difficulty in tracking the conversation. Defendant was advised the interview was being recorded. Detective Murray and Defendant were the only two people in the room during the interview. Both Detective Murray and Defendant were cordial with one another during the interview. Voices were calm and the Court did not witness any evidence of body language or posturing by either individual that could be viewed as intimidating, threatening or coercive. Both Detective Murray and the defendant were sitting in their chairs, not leaning forward. The interview resembled a conversation not an interrogation.

> "Before any questioning began, Detective Murray advised the defendant that he was not under arrest and advised him of his *Miranda* rights. The defendant was asked if he understood his rights and answered yes to the question.

> "During the interview the defendant shared his thoughts on why he thinks he is at the police department and states that it is due to false accusations by the child's mother. * * *

> "Detective Murray advised the defendant about the forensic interview of the child and that the child disclosed

---

[3] The trial court noted in its order that the length of the video "is one hour, thirty-five minutes and thirty-eight seconds" and that there are three times that Murray leaves the interview room. The total time of the actual interview—the interaction between defendant and Murray—is approximately 63 minutes.

[4] The trial court stated that it had compared a transcript of the videotaped interview of defendant that had been received as an exhibit with the video of the interview and had observed numerous errors in the transcript; it included a notation of where those discrepancies were. Those notations indicate that the court relied on its own understanding of the statements in the video. The noted differences are not substantive for purposes of our analysis. In all events, defendant does not challenge the trial court's factual findings; rather, he challenges the court's legal conclusion.

that some 'stuff' happened between her and the defendant. After he tells the defendant about the interview, the following exchange occurs:

"'Detective Murray:   What kind of what I like to do, [defendant], is is [*sic*] I like to get people help because it's—part of it's a sickness. \* \* \*

"'Defendant:   Yeah.

"'Detective Murray:   And I like to get people on the right track if something happened, whether it was just a little thing or like—I'm not saying like you, you know, held a gun to her head and did some—

"'Defendant:   (shakes head side to side) I don't even own one. \* \* \*

"'Detective Murray:   —stuff. All right. I'm not saying that. But sometimes less violent stuff like that has occurred, and sometimes people just make a stupid mistake, all right? And if they did it, this is kind of the opportunity 'cause, like, I'm—we're we're [*sic*] just in a casual setting, you and I. We're just here talking, a couple guys, to each other. I'm not shocked by anything that comes out of people's mouths. I don't judge people. So what I'm getting at is if there's something that happened, let's talk about it today and get it behind us and maybe come up with a safety plan, what might be an option. So when she talked about what you and her did, she was pretty specific. And I won't give details—not right now 'cause that's not how this works. I'm just more kind of gauging you on on [*sic*] honesty. Tell me your version and, like I say, we can get to the bottom of it. Okay? What happened? \* \* \*'

"The interview continues without the defendant admitting to any inappropriate touching of his child. Detective Murray tells the defendant the following:

"'I'm trying to help you out today by giving you this opportunity to just to be honest, because, like I said, I don't, I don't see where kids in this particular setting (referring to forensic interview) make false accusations. So I think something happened between the two of you, and that's why I'm, I'm trying to get just down to the bottom of it. You know, I'm wanting to get everybody help involved, including (the child) if she needs the proper counseling, stuff like that. \* \* \*'

"The defendant then responds that the child's mom says the counseling is not helping and Detective Murray tells the defendant that 'it may not be the right counselor. But this—this is when we get involved, we hopefully get them on that right track.' The interview continues with Detective Murray stating:

"'So here's a couple things that I like to do. I, we like to prove somebody's innocent, innocence just as much as if there if [*sic*] they did something. We've never met before, but I'm a straight shooter. I will always, if you cooperate today and if you tell me the absolute truth, I'm going to document that he was cooperative and he was truthful. That's what I'll do for you. If for some reason during this investigation—because I have to investigate it—I find out you were dishonest on anything, its going to come back and bite you. And that's why I'm giving today as your opportunity to go—if, if you've made a stupid mistake—everybody makes mistakes—then we'll—like I say, we'll talk about that and get get [*sic*] past it. But I I don't want to waste everybody's time. \* \* \*'

"Defendant continues with the interview without any clear admissions to sexual contact with his child. Detective Murray tells the defendant that something is telling him that the defendant is leaving something out and he is just looking for the defendant to be honest and states 'you know, I'm gonna, I'm gonna, I'm gonna support you.' Detective Murray also talks with the defendant about how sometimes getting things off your shoulders is a huge relief. In response the defendant responds 'my biggest worry is jail.' In response to that concern expressed by Defendant, Detective Murray replies, 'Oh, don't—we're not even talking about that right now—I want—I want to get people help is what I'm trying to do.'

"It is during the remainder of the interview that Defendant ultimately admits to sexual contact with his child and writes an apology letter to her. Later during the interview Defendant tells Detective Murray the following: 'My curiosity is—am I going to jail after this, is my mom and brother going to find out, and my fiancée going to find out about this.'"

(Footnote omitted.)

At that point, Murray asks defendant what he thinks should happen to somebody in his situation and

defendant replies, "Help. \*\*\* Get as much help as possible." When Murray asks what would be help, defendant responds, "I don't know. I mean you guys are experts on what—what's good \*\*\*." After defendant writes an apology letter to his daughter, Murray arrests him.

Thereafter, defendant was charged by indictment with one count of rape in the first degree, ORS 163.375, and one count of sexual abuse in the first degree, ORS 163.427. Before trial, defendant filed a motion to exclude the statements and admissions he made during interrogation by the police, which he asserted were illegally, improperly, and/or involuntarily obtained. Defendant specifically argued that Murray impliedly promised that defendant would get help instead of going to jail and that, considering the totality of the circumstances, defendant's statements and confession were involuntary.

As noted above, the trial court denied defendant's motion. The court explained:

> "While there was discussion about getting the defendant 'help,' none of Detective Murray's statements individually or taken as a whole, amount to an implied promise of 'help' or treatment *instead of* or *in lieu of* prosecution or jail. Detective Murray did not make an explicit promise of any kind other than he would be documenting if defendant was truthful. Even Defendant's own volunteered statements about his concern regarding jail, before and after his admissions, evidence his recognition that any 'help' was not *instead of* or *in lieu of* prosecution or jail. The defendant's affirmative inquiries about jail demonstrate his awareness of jail as a potential consequence. To construe Detective Murray's statements as an implied promise of treatment instead of or in lieu of prosecution or incarceration would not be reasonable under the totality of the circumstances."

(Emphases in original.)

Thereafter, defendant waived his right to a jury trial and proceeded with a stipulated facts trial and sentencing. The trial court found defendant guilty of both counts, sentenced him, and entered a judgment of conviction.

On appeal, defendant contends, as he did below, that the totality of the circumstances shows that defendant was

induced to make admissions by Murray's promises of help and the implication that he would not go to jail. Therefore, according to defendant, his confession was given involuntarily under ORS 136.425(1) and Article I, section 12, of the Oregon Constitution.[5] The state responds that Murray did not impliedly promise defendant leniency in exchange for his admissions; Murray did not condition any benefit on defendant making an admission, nor did Murray offer any reason for defendant to believe that he could avoid criminal prosecution. Therefore, according to the state, the trial court correctly denied defendant's motion to suppress because his admissions were made voluntarily and were not induced by promises of leniency.

We begin with the standard of review:

> "We review trial court rulings on motions to suppress for legal error, deferring to the trial court's explicit and implicit factual findings where there is evidence in the record to support them. *State v. Simmons*, 302 Or App 133, 137, 460 P3d 521 (2020). Whether a confession was the product of a prohibited inducement and whether a confession was otherwise involuntary are ultimately questions of law. *See State v. Jackson*, 364 Or 1, 22, 430 P3d 1067 (2018). Thus, the primary inquiry here is whether, in light of the trial court's factual findings, 'the state met its burden to prove that defendant's free will was not overborne and his capacity for self-determination was not critically impaired, and that he made his statements without inducement from fear or promises.' *Id.*"

*State v. Pryor*, 309 Or App 12, 18, 481 P3d 340, *rev den*, 368 Or 511 (2021).

ORS 136.425(1) states that "[a] confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats." The Supreme Court has recognized

> "that both the statute and Article I, section 12, embody the common-law rule that confessions made by a defendant

---

[5] Defendant states that he has a constitutional right not to incriminate himself under the Fifth Amendment to the United States Constitution and Article I, section 12, of the Oregon Constitution. His argument is focused on ORS 136.425(1), and he does not make a separate constitutional argument.

in custody that were induced by the influence of hope or fear, applied by a public officer having the prisoner in his charge, are inadmissible against the defendant."

*Jackson*, 364 Or at 21 (internal quotation marks omitted). Confessions are presumed to be involuntary and the "burden is on the state to overcome that presumption by offering evidence affirmatively establishing that the confession was voluntary." *State v. Chavez-Meza*, 301 Or App 373, 386, 456 P3d 322 (2019), *rev den*, 366 Or 493 (2020) (internal quotation marks omitted). The reason for the presumption is "to ensure that confessions are reliable." *Id.*

> "[W]hether a confession has been unlawfully induced turns, in essence, on (1) whether the defendant has been told something that communicates the idea of a temporal benefit or disadvantage attached to confessing, that is, that the defendant 'ha[s] been offered a quid pro quo *** in exchange for a confession,' and (2) whether the defendant accepts that quid pro quo offer by confessing in the hopes of obtaining the offered benefit."

*Pryor*, 309 Or App at 19 (quoting *Chavez-Meza*, 301 Or App at 387). It "involves a highly fact-specific inquiry." *Id.* at 20. Further, when we evaluate whether the "inducements were, at least collectively, sufficiently compelling to elicit a false confession," we apply the test from *State v. Powell*, 352 Or 210, 222, 282 P3d 845 (2012):

> "'As our cases consistently have recognized, confessions are unreliable when rendered under circumstances in which the confessor perceives that he or she may receive some benefit or avoid some detriment by confessing, regardless of the truth or falsity of the confession.'"

*State v. Center*, 314 Or App 813, 824, 499 P3d 63 (2021) (quoting *Powell*, 352 Or at 222)). We recently explained in *Center* that a promise need not be related to the defendant's criminal prosecution for it to be a compelling benefit that has legal significance. *Id.* at 823.

    As noted above, the issue as framed for and decided by the trial court was whether defendant confessed because he thought he would get "help" instead of going to jail, with the court concluding that Murray's statements did not amount to "an implied promise of treatment instead of or in

lieu of prosecution or incarceration." Given our recent case law, we do not necessarily agree that that framing of the issue accurately describes the test for assessing whether defendant's confession was voluntary. Under *Center*, a promise of help need not be tied to prosecutorial leniency; rather, a promise of some benefit, by itself, could suffice to improperly compel a confession. *Id.* However, given the parties' arguments below and the court's ruling, we consider whether the trial court erred in concluding that defendant's confession was not induced by a promise that he would get help instead of jail, alongside the broader issue of whether there was a promise by Murray that communicated to defendant that there would be a temporal benefit to confessing, namely "help," regardless of whether that offer of help was made as an alternative to jail.

Our recent decision in *State v. Rodriguez-Aquino*, 311 Or App 519, 489 P3d 1060 (2021), provides some guidance, although it is also distinguishable as to some of the significant facts. In that case, we explained that, "when an officer holds out the specter of help or assistance to a suspect during an interrogation, that officer is treading a potentially risky path," and we held, under the circumstances there, that the state did not meet its burden to establish that the defendant's confession was not the product of an unlawful inducement—"specifically, the promise of 'help,' which, in context, [could not] reasonably be understood as anything other than help with his legal problems." *Id.* at 531, 533. There, the defendant and his wife had taken their infant son to the emergency room at the hospital where it was determined that the infant's leg was broken in a manner that was consistent with physical abuse. *Id.* at 521-22. The defendant was transported to the police station on an unrelated warrant and was questioned about his son's injury after being read his *Miranda* rights and agreeing to talk. *Id.* at 522. The defendant was an immigrant and English was his third language. *Id.* at 520. The interrogation, which took place over approximately five hours, was conducted by a detective and a police lieutenant. *Id.* at 523-26.

The officers told the defendant that it was important to be honest about everything and that they just wanted to find the truth. *Id.* at 523. We summarized the interrogation:

"The officers here repeatedly invoked the district attorney and [the Department of Human Services (DHS)], and intimated, if not outright stated, that systemic help in the form of parenting classes would be contingent on defendant's honesty as reflected in the police reports. Further, those parenting classes were held out as an alternative to something more severe. That alternative was vague and unspecified, but nonetheless present. According to the officers, defendant could be seen 'as a criminal who hurt his kid on purpose,' or, in the alternative, could be honest and, 'take a parenting class or two.' Finally, the officers indicated that dishonesty would mean that 'no one' which can only be contextually understood to mean the prosecutor or judge, 'should give them any leniency or any type of help.'"

*Id.* at 533-34.

In describing our reasoning for our holding, we stated, "This is a close case. But ultimately, we conclude that the statements here communicated to defendant the idea that there would be a temporal benefit to confessing." *Id.* at 534. We explained that the officer had made it clear that he considered the truth to be that the defendant had injured his child in a fit of anger, then communicated that there would be "no turning back" if the defendant continued to maintain a "provable lie," and that he wanted to help the defendant. *Id.*

"The detective then communicated that such 'help' would be accomplished through what he included in his report, which he tied to what happens with the district attorney and DHS. The detective explained that 'DHS is obviously involved' when there is an injury to a child. Immediately after explaining his desire to help defendant and his family and referring to DHS's involvement, he stated, 'And then we—when we write our reports, we have to submit it to the District Attorney's Office *** for them to review. *And I want to make sure that you guys get the help you need if *** there is something like that going on.*' (Emphasis added.)

"Read in context, the detective indicated that he could influence DHS's involvement and the type of help defendant's family would receive through his report to the district attorney. And then, compounding that implication,

the detective suggested that DHS involvement might be an alternative path to prosecution."

*Id.* at 534-35 (ellipses in original).

At one point during the questioning, the lieutenant told the defendant that he wanted to help families and that they (the police) were there because they "want to help." *Id.* at 524. He then differentiated between good people and bad people and said that bad people lie and that "no one should give them any leniency or any type of help." *Id.* We stated that the "obvious implication" from that part of the interrogation was that "the detective was in a position to influence the leniency or help that families might get." *Id.* at 535. Ultimately, we concluded that "[t]he officers held out a thin hope that defendant might avoid the full weight of the state's prosecution and instead receive 'leniency'—perhaps in the form of DHS involvement and parenting classes in lieu of prosecution—if he were to confess." *Id.*

In contrast to *Rodriguez-Aquino*, we recently held in *Pryor*, 309 Or App at 20-21, a case involving the sexual abuse of a child, that a detective's statements referring to "help," in context of the overall exchange between the detective and the defendant, did not amount to an unlawful inducement. There, the detective told the "defendant that he would be a 'lost cause' until he admitted what had happened and got help." *Id.* at 15. He stated, in part, "No one can help you. You will never get help. You will be the monster that people think you are * * * [b]ecause no one's going to get help unless they can admit to what they did wrong or admit that they had a problem or had a lapse in judgment." *Id.* at 15-16. The detective also stated that he had been working with kids and people for 25 years and that "the only people [he] ever see[s] get help are people that can talk about it. They admit what happened and help us understand." *Id.* at 16. The detective also told the defendant that he was going to be able to "go home today." *Id.* We concluded that

"the statements did not communicate that a quid pro quo was on the table—that [the detective] was offering freedom and access to help to defendant *in exchange* for his confession. Rather, [the detective's] statements, in context, communicated that defendant would be going home at the end of

the day one way or another, and that, in his experience, people who confessed were the ones who were able to get help."

*Id.* at 20 (emphasis in original).

Although some of the circumstances here are similar to those in *Rodriguez-Aquino*—both involve a situation in which the defendant is being interrogated about the abuse of his child, which could include involvement by DHS, and both defendants are offered "help" during police questioning—the cases are distinguishable. In *Rodriguez-Aquino*, we concluded that the detective had indicated to the defendant that DHS was "obviously involved" and that he could influence DHS's involvement and the type of help the family would receive through his report to the district attorney. *Id.* at 534-35. The detective also suggested that DHS involvement might be an alternative to prosecution. *Id.* at 535. Here, Murray made general, somewhat vague offers of help. Murray did not mention an existing DHS proceeding or investigation, nor did he mention the district attorney. Unlike in *Rodriguez-Aquino*, there was no offer of help here that was tied to a particular benefit in a way that it might induce a confession. Although Murray's statements regarding help are not identical to those made by the detective in *Pryor*, they are closer, in context, to the kind of statements made in *Pryor* to the extent that they similarly do not offer any quid pro quo or suggest any temporal benefit for defendant's confession.

We turn to the specific arguments of the parties. Defendant contends that by continuously promising to get defendant help and telling defendant that they were not talking about jail right now, Murray led defendant to believe that if he admitted that the things his daughter said were true, he would get help instead of jail. Defendant essentially argues that the key statement of the interview was when he stated that his "biggest worry is jail" and Murray replied, "Oh. Don't—we're not even talking about that right now. I want—I want to get people help is what I'm trying to do."[6]

_____

[6] For the remainder of this opinion, we quote from the transcript of the interview, which was admitted as a defense exhibit. As noted above, the trial court's findings contained its understanding of the conversation after viewing the video and comparing it with the transcript, and those differences do not affect the substance of our analysis.

According to defendant, that exchange was essentially tell-ing defendant that if he confessed, he would not go to jail and instead he would get help. And, in defendant's view, considering that exchange in the context of the whole inter-view, including the offers of help Murray made leading up to that exchange and defendant's question after his confession about whether he would be going to jail, leads to the conclu-sion that defendant's statements were involuntary.

The state argues that Murray's references to help, viewed individually or taken as a whole, are not reasonably construed as implied promises of leniency, nor did those statements induce defendant's admissions. According to the state, none of Murray's offers of help leading up to the exchange in which defendant referred to jail were offers of help in lieu of prosecution or jail. The first reference to help, when Murray stated that he "like[s] to get people help because it's—part of it's a sickness," was near the beginning of the interview when Murray was trying to establish a rap-port with defendant; the state asserts that the implication that help or treatment may generally be available for defen-dant said nothing about whether defendant would also face prosecution or incarceration should he confess to sexually abusing his daughter. We agree with that assessment. *See State v. Neblock*, 75 Or App 587, 590, 706 P2d 1020 (1985) ("Advising defendant that treatment is an option, or that confession is a prerequisite to treatment, is not the same as promising him immunity from prosecution.").

The second and third references to "help" by Murray are when he states,

> "I'm trying to help you out today by giving you this oppor-tunity just to be honest, because, like I said, I don't—I don't see where kids in this particular setting make false accu-sations. So I think something happened between the two of you, and that's why I'm trying to get just down to the bottom of it.
>
> "You know, I'm wanting to get everybody help involved, including [the child] if she needs the proper counseling, stuff like that, which—"

Here, the offer of "help" by way of giving defendant the opportunity to be honest was just that—asking defendant to

tell the truth. *See Jackson*, 364 Or at 24 (citing *State v. Linn*, 179 Or 499, 510, 173 P2d 305 (1946) (noting the difference between a "mere adjuration" to tell the truth and "adjuration accompanied by inducement" to confess)). And the statement of wanting "to get everybody help involved, including [the child]," considered in context, is Murray explaining that part of his goal is to get help for others—including the *victim*—not just for defendant. That reference to help was not an offer to defendant in lieu of jail or prosecution. Nor was that vague promise to "get everybody help" one that could be reasonably viewed as offering defendant a benefit that he would receive by confessing "regardless of the truth or falsity of the confession." *Center*, 314 Or App at 824 (internal quotation marks omitted).

Before we turn to the final exchange that the parties agree contains the key statement for purposes of this analysis, we note that up until this point in the interview, Murray and defendant had not discussed possible criminal charges, how charges would move through the criminal justice system, or penalties that could result from those possible charges. Defendant is the first person to mention "jail." During the interview, Murray raised the possibility of defendant taking a polygraph; after that, the following exchange occurred.

"MURRAY: *** And because your daughter said it happened, I—I got to do everything in my power to—so it's like I'm saying, some part of your body, [defendant], is telling me there's something you're leaving out, and I don't know exactly what it is. I just—I'm looking for you to be honest.

"What happened, man?

"[DEFENDANT]:  (No audible response.)

"MURRAY:  Go ahead. You know, I'm going to—I'm going to—I'm going to support you.

"[DEFENDANT]:  I just—

"MURRAY:  I know it's tough to say sometimes, but sometimes getting it off your chest and off your shoulders is a huge relief.

"[DEFENDANT]:  My biggest worry is jail.

"MURRAY:   Oh. Don't—we're not even talking about that right now. I want—I want to get people help is what I'm trying to do.

"So, if you did something—

"Look at me, [defendant]. Did you have sex with her?

"[DEFENDANT]:   No."

Shortly thereafter, defendant began to make admissions.

Defendant contends that Murray's tactic—his implied promise that defendant would get help rather than go to jail—was successful in inducing defendant to confess. The trial court and the state view the exchange differently than defendant. The trial court concluded that

"[e]ven Defendant's own volunteered statements about his concern regarding jail, before and after his admissions, evidence his recognition that any 'help' was not *instead of* or *in lieu of* prosecution or jail. The defendant's affirmative inquiries about jail demonstrate his awareness of jail as a potential consequence."

(Emphases in trial court's order.) And the state asserts that Murray's statement that they were not talking about jail "right now" could reasonably be interpreted as Murray communicating, accurately, that those conversations would occur later. At a minimum, the detective's statement that they were not talking about jail "right now" cannot reasonably be understood as an offer that defendant was being offered help instead of jail and, in fact, kept the possibility of jail remaining. *See, e.g.*, *State v. Spieler*, 269 Or App 623, 632, 346 P3d 549 (2015) (detective's statements presumed there would be a prosecution and pertained to effect of the defendant's conduct on that prosecution rather than suggesting that no prosecution would be commenced if the defendant made an admission).

Further, toward the end of the interview, Murray asked defendant if he had left anything out, and then the following exchange occurred:

"[DEFENDANT]:   I—I told you all the truth.

"MURRAY:   Okay.

"[DEFENDANT]: My curiosity is—am I going to jail after this? Is my mom and brother going to find out, and my fiancée going to find out about this?

"MURRAY: Let me ask you. What—what do you think should happen to somebody in your situation?

"[DEFENDANT]: Help.

"MURRAY: Just help?

"[DEFENDANT]: Get as much help as possible.

"MURRAY: And what—what would be help in your mind?

"[DEFENDANT]: I don't know. You guys are experts on what—what's—what's a good—

"MURRAY: I know, but everybody's got their own opinion. They can—

"[DEFENDANT]: Well, I've already thought about it. She's been fighting me on this whole custody thing the whole time, and that's what she wants to do is take [the child] away.

"MURRAY: Yeah.

"[DEFENDANT]: I'm half tempted to just give her.

"MURRAY: Just want to give it up?

"[DEFENDANT]: Because—

"MURRAY: Do you think what you did is wrong?

"[DEFENDANT]: I know what I did was wrong. I just feel so guilty."

A reasonable understanding of that exchange is that defendant did not expect that he would avoid going to jail by confessing, nor did he have an expectation of a particular kind of help that would be available to him. When asked about what defendant meant by getting help, he shifted the conversation to giving up custody of his daughter to her mother and expressed guilt over what he had done. Viewing the interview as a whole, we conclude that defendant himself did not interpret Murray's references to help as an implied promise of leniency in return for a confession; nor did those references to help convey any specific offer that induced defendant to confess.

As noted, we described *Rodriguez-Aquino* as a close case but ultimately concluded that the nature of the offer of help that specifically suggested an ability to influence leniency with the District Attorney and also affect DHS's involvement crossed the line. 311 Or App at 534-35. The offer to help here is far more generic and, we conclude, falls on the other side of that line. The trial court was correct to conclude that defendant's statements were made voluntarily.

Our analysis does not end there. Under *Jackson*, "we must look to the totality of the circumstances in reaching a legal conclusion about the voluntariness of defendant's statements." 364 Or at 22. That inquiry requires us to "consider[] additional evidence about whether defendant confessed voluntarily or whether his will was overborne." *Id.* at 27-28. As noted above, the trial court made findings about the nature of the interview itself, and defendant does not dispute any of those findings, nor does defendant assert that anything about the interview other than Murray's statements led defendant to involuntarily confess. Rather, defendant argues that the totality of the circumstances show that defendant was induced to make admissions by Murray's promises of help and the implication that he would not go to jail. We understand defendant's argument in that regard to be that Murray's statements in the context of the entire interview led defendant to make involuntary statements. We have already addressed that argument above.

Defendant came to the police station voluntarily after Murray called him and asked him to come in. Murray understood that the victim's mother had already told defendant about the allegations that their daughter had made. Murray was dressed in plain clothes with a visible gun and handcuffs on his belt, and he greeted defendant and his fiancée in the lobby of the police station.

The total time of the interview was relatively short—approximately 90 minutes—and the time Murray spent interacting with defendant was a little over an hour. Before any questioning began, Murray advised defendant of his *Miranda* rights, which defendant indicated that he understood. Murray did not notice any signs of impairment or cognitive defect on the part of defendant; the trial court

specifically found that "defendant followed the conversation with ease and did not exhibit any difficulty in tracking the conversation." Murray and defendant were cordial with each other, their voices were calm, and their body language did not indicate posturing by either of them that could be viewed as intimidating, threatening, or coercive. At one point, Murray offered defendant water and provided coffee to defendant when he asked for that instead. On the whole, the entire interview indicated that defendant's responses were voluntary, and his will was not overborne.

In addition, after defendant admitted what he did and before he wrote an apology to his daughter, he expressed some remorse, stating, "I know what I did was wrong. I just feel so guilty."

For all of the reasons stated above, we conclude that, in light of the totality of the circumstances of the interrogation, the state met its burden in the trial court to show that defendant's statements to the detective were made by his own choice and his will was not overborne. Accordingly, we affirm the trial court's denial of defendant's motion to suppress.

Affirmed.