Submitted April 25, 2019, affirmed February 3, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DUSTIN LEE PRYOR,
*Defendant-Appellant.*

Lincoln County Circuit Court
16CR79489; A165359

481 P3d 340

Defendant appeals a judgment of conviction for two counts each of first-degree sodomy, ORS 163.405, and first-degree sexual abuse, ORS 163.427. He assigns error to the trial court's denial of his motion to suppress a confession that he made during a police interview. Defendant contends that his confession was induced by a promise of leniency—the detective told defendant that he would be going home after the interview—in violation of ORS 136.425(1) and the state and federal constitutions. He also argues that, under the totality of the circumstances, his admissions were involuntary because the detectives used coercive interrogation techniques and the interview was lengthy. *Held*: The trial court did not err in denying defendant's motion to suppress his confession. None of the detective's statements suggested that defendant could obtain a benefit in exchange for his confession, and, under the totality of the circumstances, defendant's confession was not otherwise the product of his will being overborne.

Affirmed.

Thomas O. Branford, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Shawn Wiley, Deputy Public Defender, Office of Public Defense Services, filed the opening brief and a supplemental brief for appellant. Dustin L. Pryor filed a supplemental brief *pro se.*

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Timothy A. Sylwester, Assistant Attorney General, filed the briefs for respondent.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

LAGESEN, P. J.

Affirmed.

**LAGESEN, P. J.**

Defendant appeals a judgment of conviction—by a jury—for two counts each of first-degree sodomy, ORS 163.405, and first-degree sexual abuse, ORS 163.427. The primary issue before us is whether the trial court erred in denying defendant's motion to suppress the confession that he made during a police interview. Defendant contends that his confession was induced by a promise of leniency, in violation of ORS 136.425(1), and was otherwise involuntary in violation of Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution. We conclude otherwise and affirm.

We state the facts in accordance with the trial court's findings of fact as supplemented by the record. The facts are uncontested.

While in foster care, L told her foster mother that "it tickled when [defendant] put his tongue in her pee pee and that he wanted *** her to put her tongue on his pee pee." L's foster mother asked who defendant was, and L replied, "Mama's boyfriend." L's foster mother immediately reported L's disclosure to the police.

Shortly thereafter, Detective Lane met with defendant at the police department to interview him regarding L's allegations. Defendant and Lane drove separately to the police department, and Lane told defendant that the interview was voluntary and that he was free to leave at any time.

During the interview, Lane confronted defendant with L's allegations. Defendant denied them but reported that L had seen his penis when she had "pantsed" him and when she had walked in on him using the bathroom. He also reported that L had grabbed his penis over his sweatpants. At the close of the interview, Lane asked defendant to come back for a second interview and a polygraph examination. Defendant agreed to come back.

The polygraph examination and second interview took place two weeks later. Defendant again drove himself to the police station. The interview began shortly before 10:00 a.m., when the polygraph specialist, Detective Martin,

thanked defendant for coming to the station and explained that defendant was not required to take the exam. Even though defendant was not under arrest, Martin informed him of his *Miranda* rights before conducting the exam. She did so at a pace that was not rushed, and defendant signed a form indicating that he understood them.

  The pretest polygraph procedure lasted around an hour, during which Martin asked defendant questions about his sleep, hunger, and other physiological factors that could have affected defendant or the results of the test. At the close of the pretest, defendant got up and walked out of the room. Martin did not try to stop him, and defendant took a nine-minute break before returning for the exam.

  The tone of the exam itself was casual and conversational; Martin was in plain clothes and defendant appeared relaxed and chuckled at several of his own statements. Defendant had brought a drink with him and occasionally sipped from it. The polygraph examination itself lasted 15 to 20 minutes, and, after an hour and 18 minutes total, the polygraph process was finished. At that point, Martin invited defendant to take another break, and defendant left the room for 10 minutes. When he returned for the post-test interview, which began at 11:27 a.m., Martin informed defendant that he had failed the polygraph exam and told him that she would like to talk to him about that.

  Martin told defendant that she did not believe that defendant was being truthful. Martin explained:

> "I don't think you're some bad guy that's going around grabbing little kids off the street or anything. I think it was just one of those things that happened that maybe (inaudible) in a certain way and, and you normally wouldn't do something like that. It was just out of the norm for you and it, and it happened with her. I understand that. People will understand that.
>
> "But what we don't understand and what we do worry about is people who know that they did it, everybody knows they did it, and they continue to deny it. And that doesn't help anybody. It doesn't help you. It doesn't help [L]. It doesn't help anybody in this situation. I'd like you to get this

behind you today and give you a chance. Get this off your chest. Let's, let's talk about it so you can move forward."

In response, defendant continued to deny any wrongful behavior, insisting that he was trying to tell Martin the truth. He nonetheless began to add more details to his descriptions of what had happened with L, explaining that "[L] asked me if she could see it" and "[w]hen she grabbed me, I was horrified. I didn't know what to do." Defendant told Martin that L had "started it" and frequently asked him to touch her, but that he had refused. He appeared emotional in recounting these details, covering his head in his hands and crying. Defendant responded to some but not all of Martin's questions; Martin continued to ask questions at a relaxed pace with frequent pauses. After roughly an hour of questioning, defendant asked for a break to use the restroom, which Martin promptly honored.

Fourteen minutes later, defendant returned to the room. He talked about a horrific experience that he had had earlier in his life. Martin posited that defendant was trying to avoid talking about the allegations, and defendant insisted that he was not doing that.

A few minutes later, Lane entered the room. He encouraged defendant to tell the truth about what had happened and told defendant that he would feel better once he did. Lane also told defendant that "an unknown male's DNA" was found on L—a lie—and asked if that DNA would match defendant's DNA. Lane also told defendant that he would be a "lost cause" until he admitted what had a happened and got help:

"I already know you put your tongue on her (inaudible). I already know that your penis was in her mouth. If you didn't get aroused, those two things would not have happened. And they did happen. So you've got to (inaudible). Until you do, you are a lost cause.

"And that's, that's the truth right there. No one can help you. You will never get help. You will be the monster that people think you are. (Inaudible) make you the monster that they think you are. Because no one's going to get help unless they can admit to what they did wrong or admit that

they had a problem or had a lapse in judgment. And you're not giving us anything here, dude.

"*** He's blaming [L] for all of this. Now who would blame a child for their own problems? Who does that, [defendant]?

"Is that what your official response to this allegation is? You're blaming a four-year-old for coming on to you sexually? Who is going to buy that? No one who knows. And I can't imagine a jury just would ever go that far. I certainly don't see the judge believing that.

"But I do know children sometimes do some really peculiar things, because I've been doing this for a long time. (Inaudible) 25 years working with kids and people, and the only people I ever see get help are people that can talk about it. They admit what happened and help us understand.

"And you know that everything I've been telling you, [defendant], you already know, because you're not dumb. You're a smart guy. You know that I'm speaking to you straight.

"I understand you're afraid. I get that. But like I already told you, you get to go home today. You're walking out.

"THE DEFENDANT:    I'm not afraid. I'm *** terrified."

Lane asked defendant why he was terrified but defendant did not answer. Instead, four hours and 16 minutes into the process, he asked to step outside of the interview room with Lane.

Defendant took a 13-minute break where he smoked and told Lane about a condition he thought, from research that defendant had been doing on his own, that he had and that he believed made it difficult for him to speak about traumatic things. Defendant confided that he had been suicidal in the past on several occasions. He also said that he was willing to talk to Lane about L. They returned to the room, and, soon after, defendant admitted to engaging in sexual behavior with L.

Thereafter, a grand jury indicted defendant on two counts of first-degree sodomy, ORS 163.405, and two counts of first-degree sexual abuse, ORS 163.427. Before trial, he moved to suppress the statements that he had made to the

detectives during the interviews. Defendant argued that (1) the detectives impliedly promised leniency in exchange for his confession, (2) under the totality of the circumstances, defendant's statements were not voluntary, and (3) even if defendant waived his *Miranda* rights at the outset of the interview, he invoked them later by remaining silent for extended periods of time in response to questioning.

The trial court denied defendant's motion to suppress. In considering defendant's assertion that the detectives promised leniency, the court found:

> "There was no express or implicit promise that the Defendant would not be prosecuted or that he would receive leniency from the police and/or the courts. Telling a suspect that he is not in custody and that he will not be arrested that same day, regardless of his answers, communicates no express or implied promise of a legal benefit or disadvantage. It does tell the suspect that he/she is not in custody and that the person is, and will remain, free to leave that day. Such statements do not contravene ORS 136.425(1)."

In weighing whether defendant's confession was voluntary under the totality of the circumstances, the court found as fact that Martin was "calm" and "conversational," and that Lane was "quiet and decent in manner" throughout the interview. The court added that, though Martin was "direct" with defendant "about the possibility of abuse" of L, the detectives' questions were "open-ended," "low-key," and that "[t]here was nothing about the officers' questions which remotely implicated badgering behavior." It further determined that defendant's assertions that he was trying to tell the truth were evidence of defendant's continued willingness to speak with the detectives. The court also noted that every request by defendant for a break was granted—including defendant's request after the "apparently pivotal point" in the interview where defendant expressed that he was "terrified"—that defendant never asked to end the interview despite understanding his *Miranda* rights, and that the detectives never tried to force defendant to go through with questioning. The court determined that defendant's request for breaks during the more intense moments of the interview further demonstrated that defendant knew that he could leave at any time—a conclusion that, the court

reasoned, was supported by the fact that the detectives never restricted defendant's movement during the breaks, allowing defendant to walk to his vehicle and otherwise spend his time away from their supervision. It therefore concluded that "the interactions of the officers with the Defendant did nothing to impart a belief by the Defendant that he was compelled to answer their questions." The court also concluded that nothing defendant did during the interview constituted an assertion of his right to remain silent.

Defendant exercised his right to a jury trial, and the jury returned a verdict of guilty on all counts. He appeals and, as noted, assigns error to the trial court's denial of his motion to suppress. He argues that the detectives' promise that he would be going home after the interview was an implied promise of leniency that required suppression of his statements under ORS 136.425(1), Article I, section 12, and the Fifth Amendment. He also argues that, under the totality of the circumstances, his admissions were not voluntary, because the detectives used coercive interrogation techniques and the interview was lengthy. The state maintains that the court properly denied defendant's motion to suppress, contending that the facts as found by the court do not support defendant's claim that his confession was the product of a promise of leniency or otherwise involuntary.

*Standard of review.* We review trial court rulings on motions to suppress for legal error, deferring to the trial court's explicit and implicit factual findings where there is evidence in the record to support them. *State v. Simmons*, 302 Or App 133, 137, 460 P3d 521 (2020). Whether a confession was the product of a prohibited inducement and whether a confession was otherwise involuntary are ultimately questions of law. *See State v. Jackson*, 364 Or 1, 22, 430 P3d 1067 (2018). Thus, the primary inquiry here is whether, in light of the trial court's factual findings, "the state met its burden to prove that defendant's free will was not overborne and his capacity for self-determination was not critically impaired, and that he made his statements without inducement from fear or promises." *Id*.

*Inducements.* The first question before us is whether defendant's confession was involuntary as the product of

unlawful inducement in violation of ORS 136.425(1) and Article I, section 12. *See Jackson*, 364 Or at 21 (explaining that "both the statute and Article I, section 12 embody the common-law rule" precluding the evidentiary use of confessions induced by threats or promises). That statute provides, in part:

> "A confession or admission of a defendant * * * cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats."

ORS 136.425(1) "encompasses the common law and thus applies to confessions induced by promises of leniency as well as by threats." *State v. Powell*, 352 Or 210, 218, 282 P3d 845 (2012). "For purposes of ORS 136.425, a promise constitutes an improper inducement if it communicates to the prisoner the idea of a 'temporal benefit or disadvantage,' thereby causing the prisoner to confess[.]" *Simmons*, 302 Or App at 137 (quoting *State v. Wintzingerode*, 9 Or 153, 163 (1881)). Those promises may be express or implied:

> "The precise form of words in which the inducement is presented to the [defendant's] mind is immaterial. It is sufficient if they convey to him the idea of temporal benefit or disadvantage, and his confession follows in consequence of the hopes thereby excited."

*Wintzingerode*, 9 Or at 163. Thus, whether a confession has been unlawfully induced turns, in essence, on (1) whether the defendant has been told something that communicates the idea of a temporal benefit or disadvantage attached to confessing, that is, that the defendant "ha[s] been offered a *quid pro quo* * * * in exchange for a confession," and (2) whether the defendant accepts that quid pro quo offer by confessing in the hopes of obtaining the offered benefit. *State v. Chavez-Meza*, 301 Or App 373, 387, 456 P3d 322 (2019), *rev den*, 366 Or 493 (2020); *Simmons*, 302 Or App at 139; *see also State v. Hogeland*, 285 Or App 108, 116-17, 395 P3d 960 (2017) (discussing quid pro quo requirement). In conducting our review, we keep in mind that the state bears the burden of demonstrating that a confession was not the product of an unlawful inducement. *State v. Vasquez-Santiago*, 301 Or App 90, 106 n 4, 456 P3d 270 (2019).

In defendant's view, Lane's statements—that defendant would "get to go home today," that defendant could get help, and that defendant could avoid being viewed as a "monster"—constituted promises of leniency meant to induce a confession. Defendant argues:

> "The detective's meaning would be plain to any reasonable person in defendant's circumstances: we know you did this. If you continue to talk to us and tell us what happened, you will not be considered a monster, *you can get help, and you will walk out of this station and not be arrested*. That is a promise of leniency in exchange for defendant continuing to waive his right to silence and continuing to cooperate with the officers, requiring suppression as a matter of law."

(Emphasis added.)

As should be evident, the question whether a confession was unlawfully induced involves a highly fact-specific inquiry. Although in a different context statements such as Lane's could potentially operate as inducements, viewed in the context of Lane's overall exchange with defendant in this case, the statements on which defendant focuses did not communicate what defendant argues that they did. That is, the statements did not communicate that a quid pro quo was on the table—that Lane was offering freedom and access to help to defendant *in exchange* for his confession. Rather, Lane's statements, in context, communicated that defendant would be going home at the end of the day one way or another, and that, in his experience, people who confessed were the ones who were able to get help. *Cf. Hogeland*, 285 Or App at 110 (unlawful inducement when interrogating officer's statement could have been reasonably understood to mean that the defendant would not be prosecuted if he confessed—officer stated that if "an accident has happened[,] *** *[d]o we convict* this person and make them a huge [example] for the world to see? *No.* We make sure this person has help" (third brackets and emphases in original)). Similarly to the help statement, in context, Lane's monster statement communicated to defendant that, based on his experience, *the effect* of confessing would be that he could avoid being perceived as a monster, not that Lane was offering some form of assistance in exchange for defendant's confession. Consequently, because Lane's statements did

not raise the prospect of defendant obtaining a benefit *in exchange* for his confession, the trial court was correct to conclude that they did not constitute unlawful inducements.

*Other voluntariness issues.* The next question is whether, notwithstanding the absence of unlawful inducements, defendant's confession was otherwise involuntary, thereby precluding its admission under Article I, section 12, or the Fifth Amendment. Under the state and federal constitutions, the legal test for involuntariness is whether defendant's will was overborne under the totality of the circumstances, thereby resulting in his confession: "[T]he voluntariness of an admission or confession depends on whether or not, in the totality of the circumstances, a defendant's free will was overborne and his or her capacity for self-determination was critically impaired." *Jackson*, 364 Or at 21, 27-28 (explaining that the standards under the state and federal constitutions do not meaningfully differ, and noting the types of circumstances that bear on whether a defendant's confession was voluntary, such as the defendant's mental ability, the detectives' methods of interrogation, the length of the interrogation, its location, and whether the defendant was given breaks). A confession in Oregon is considered involuntary unless the state proves by a preponderance its voluntariness. *Id.* at 21; *State v. Belle*, 281 Or App 208, 213, 383 P3d 327 (2016).

Defendant argues that his confession was involuntary under the totality of the circumstances for four reasons: (1) the detectives promised that he would be free to leave after the interrogation, (2) the detectives lied to him about finding an "unknown male's DNA" on L, (3) the detectives used coercive techniques such as "maximization" and "minimization" to elicit a confession, and (4) the interview was between four and five hours long.[1] Although, as we discuss, some of those circumstances are the types of circumstances that can cut against a conclusion that a confession

---

[1] As mentioned earlier, during his interview with Lane, defendant suggested to Lane that he might have some sort of condition that made it hard to talk. Defendant has not suggested in this case that whatever condition he might have—if any—bears on the question of whether his confession was voluntary. *See Jackson*, 364 Or at 28 (noting that voluntariness inquiry takes into account a defendant's personal characteristics, including physical and mental health).

is voluntary, ultimately, the totality of the circumstances surrounding defendant's confession demonstrates that his free will was not overborne at the time that he made it.

As for the matter of police deception, we have recognized that police deception weighs against a finding of voluntariness; deception, however, does not automatically render a confession involuntary. For example, in *Chavez-Meza*, we determined that the defendant's confession was voluntary even though the detectives deceptively and incorrectly advised the defendant that, if he had believed that the 12-year-old victim was 18, then the charged crimes would be less serious. 301 Or App at 389-90. That was because the other circumstances in that case, many of which are similar to those here, demonstrated that the defendant's confession was nevertheless voluntary:

> "[D]efendant was not in custody at any time during the interview. He appeared voluntarily at an interview with two detectives and sat in the room next to the door. Defendant was told he was free to leave at the outset of the interview, and he was informed that he would be permitted to leave at the conclusion of the interview. The detectives also informed defendant of his *Miranda* rights at the beginning of the interview. The interview lasted approximately two hours. Defendant's answers do not show that he misunderstood the detectives' questions or appeared to be under particular duress. Finally, defendant ultimately made his most damaging admissions during periods of the interview that were largely in response to fact-based questions about what had occurred during the times he met with the victim. After those admissions, defendant expressed great relief[.]"

*Id.* at 391-92.

Here, when considered under the totality of the circumstances and in view of *Chavez-Meza*, the detective's false representation does not point to the conclusion that defendant's will was overborne. Unlike the false representation at issue in *Chavez-Meza*, the detective's misrepresentation did not suggest that it would be beneficial to defendant to say any particular thing. By contrast, in *Chavez-Meza*, the detective's statement implied that it could be beneficial to the defendant to admit the conduct, but state that he had

not been aware of the victim's age. That implication of a benefit—something not offered by the false statement about DNA evidence—is something that could have some effect on a defendant's ability to exercise free will in deciding not to talk. Yet, notwithstanding that implication, we determined that the totality of the circumstances demonstrated that the defendant's decision to talk was voluntary. The circumstances here lead to the same conclusion.

Regarding the officers' interview tactics, although the detectives "maximized" their certainty of defendant's wrongdoing while "minimizing" or normalizing defendant's crimes in an effort to persuade defendant to confess, we agree with the trial court that the detectives' tactics in this case, when considered in the balance of the circumstances, did not result in defendant's will being overborne. *See Jackson*, 364 Or at 31 ("The question that a trial court must decide is not whether a particular interrogation method was used, but whether, considering the totality of the circumstances, the suspect's will was overborne."). Here, as the court recognized upon review of the interview recordings, though the detectives were "direct" with defendant "about the possibility of abuse," they were "quiet and decent in manner," their questions were "open-ended" and "low-key" throughout the interview, and none of their questions "remotely implicated badgering behavior."

That the tactics did not result in defendant's will being overborne in these circumstances is supported by defendant's own conduct throughout the interviews, which indicates that defendant recognized that it was his choice whether to speak. Defendant repeatedly told the detectives that he was trying to tell them the truth; in the middle of the interview, defendant insisted that he was not trying to avoid talking about the allegations; when defendant requested a break during a "pivotal point" in the interview, he asked Lane to join him; and, after confiding in Lane about his troubled past during his smoke break, he stated that he was willing to talk about L.

With respect to the interview's length, it was long—between four and five hours. That is a duration that often cuts against a determination of voluntariness. But, again,

the particular circumstances of each case matter, and, in this case, those particular circumstances show that the time was not an unbroken continuum controlled by the officers but, instead, was punctuated with regular breaks at defendant's request. The interview began around 10:00 a.m.— when defendant voluntarily reported to the police station as scheduled—and went through the middle of the day. Defendant's requests for breaks—of which he took four, each lasting from nine to 14 minutes—were immediately honored. As a result of the officers honoring his requests for breaks, the longest defendant was interviewed without a break was roughly an hour and a half. When defendant requested breaks, the officers did not insist on accompanying him, something that, the trial court reasoned, served as a reminder that defendant was free to go whenever he wished. When Lane did accompany defendant on his final break, it was at defendant's request, another indication that defendant's decision to speak with detectives was not the product of his will being overborne but, instead, the product of his choice to talk.

Finally, the remaining circumstances all point to the conclusion that defendant's confession was not the product of an overborne will. Defendant was not in custody; he was invited to the second interview and drove himself there. Despite not being in custody, Martin read defendant his *Miranda* rights and made sure that he understood them. Defendant was advised on multiple occasions that he was not required to be there and that he would be going home that day no matter what he told the detectives. *Cf. Chavez-Meza*, 301 Or App at 391-92 (concluding that a confession was voluntary under comparable circumstances). Defendant controlled when he spoke and when he did not: He chose to answer many of the detectives' questions, but responded with silence to many others. Further, as evidenced by the pretest polygraph procedure, defendant did not suffer from any form of cognitive impairment during the interview. Although the interview process was no doubt physically and mentally demanding, "the fact that an interrogation is physically and mentally demanding does not necessarily make the admissions that are adduced involuntary and inadmissible." *Jackson*, 364 Or at 31. All of this leads to

one conclusion: Defendant confessed on his own terms. His capacity for free will was not overborne.

*Loose ends.* We have a few loose ends to address. In a supplemental brief, defendant assigns error to the trial court's instruction that only 10 jurors needed to find defendant guilty to convict him, although he acknowledges that the jury's verdict on each count was unanimous. That claim of error is foreclosed by *State v. Flores Ramos*, 367 Or 292, 294, 334, 478 P3d 515 (2020) (holding that error in instructing the jury that it could return nonunanimous guilty verdicts did not require reversal of convictions rendered by unanimous guilty verdicts), and *State v. Kincheloe*, 367 Or 335, 339, 478 P3d 507 (2020) (same).

In a *pro se* supplemental brief, defendant also assigns error to (1) the state's use of the polygraph at a pretrial hearing, (2) the trial court's failure to exclude Lane from the courtroom during other witness testimony, and (3) defendant's exclusion from a meeting in chambers between the trial court judge and counsel. Those contentions are not preserved, and we reject them for that reason.

Affirmed.