684 December 11, 2024 No. 888

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RYAN THOMAS MONACO,
*Defendant-Appellant.*

Multnomah County Circuit Court
17CR48942; A177164

Michael A. Greenlick, Judge.

Submitted June 17, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Neil F. Byl, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Erica L. Herb, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.*

AOYAGI, P. J.

Affirmed.

------------

* Egan, J., *vice* Jacquot, J.

**AOYAGI, P. J.**

Defendant was convicted of murder and other crimes, based on his starting an apartment fire that killed two people. On appeal, he raises two assignments of error. First, he argues that the trial court erred in denying his motion to suppress incriminating statements that he made during a four-hour police interrogation. Second, he argues that the trial court erred in denying his demurrer to felony-murder charges, because Oregon's felony-murder statute, ORS 163.115(1)(b), violates federal due process. We conclude that the state met its burden to prove that defendant's statements were voluntary and that the court therefore did not err in denying the motion to suppress. We further hold that Oregon's felony-murder statute does not violate due process. Accordingly, we affirm.

## FACTS

The facts are relevant only to the suppression ruling, so we state the facts in accordance with the standard of review for that ruling, deferring to the trial court's explicit and implicit factual findings. *State v. Belle*, 281 Or App 208, 210, 383 P3d 327 (2016).

Defendant and A began dating in 2013. From approximately 2013 to 2017, they lived together, on and off, in an apartment. They had a volatile relationship that often became physical. In February 2017, defendant assaulted A, and she obtained a restraining order. Despite the restraining order, A frequently invited defendant to the apartment. J and T also lived in the apartment.

On July 22, 2017, A and defendant went to a bar together and got into an argument. A tried to leave the bar without defendant, but defendant blocked her path with his car and demanded that she get in. A complied because she was afraid of what would happen if she did not. Defendant drove to A's apartment. Once inside the apartment, defendant went to the bathroom, and A took the opportunity to leave.

A returned to the apartment later that night to see if defendant was still there. As she drove into the parking

lot, defendant rear-ended her car with his car. A drove away, but defendant followed her and struck her car multiple times as they drove on the freeway at speeds of 75 to 80 miles per hour. Finally, A slammed on her brakes, and defendant kept driving. A called 9-1-1 at 2:42 a.m. to report the incident, then she drove to her sister's house. Meanwhile, defendant texted and called A repeatedly, begging her to return to the apartment. He told her at least once that he was going to drench her couch in gasoline and light it on fire, and he repeatedly tried to videocall her so she could watch him pour the gasoline.

A short while later, defendant called A and told her that he was "really sorry," that he "really fucked up," and that he was "going to take [his] own life over it." A couple minutes after that, A received a text message from A's other sister that A's apartment was on fire. A neighbor's surveillance system captured video images of defendant running out of A's apartment seconds before the fire erupted at 3:30 a.m. The fire spread quickly. Both J and T died in the fire. A dog and three snakes also died. Around 3:30 a.m., defendant sent A multiple text messages saying that he was so sorry but that A "did this" and had thereby ruined not only defendant's life but also their dogs' lives, their roommates' lives, and A's own life.

The arson investigator determined that the fire started in the living room after someone poured accelerant on the couch.

Three days after the fire, the police arrested defendant following a brief pursuit. The arresting officer removed defendant from his vehicle and handcuffed him. Defendant was acting confused, was sweating, and looked like he was about to pass out. Defendant was taken by ambulance to the hospital, where he was given a CT scan and blood and urine tests. Defendant was released from the hospital around 1:00 a.m. He was taken to the Justice Center in Portland, where he slept for the night.

Around noon the following day, Detectives Michaels and Luiz took defendant to an interrogation room. Michaels advised defendant of his *Miranda* rights, which defendant

said that he understood. Michaels asked about defendant's relationship with A, including the event that led her to get a restraining order against him. Defendant agreed that he had a volatile relationship with A but denied ever hitting her. He said that, despite the restraining order, A invited him to the apartment nearly every day.

Michaels asked defendant about the night of the fire. Defendant said that he and A had been at a bar with his coworkers but left the bar after having an argument. They went back to the apartment. While defendant was in the bathroom, A left the apartment and drove away. Defendant said that he then left the apartment, went to his children's mother's house around 2:00 a.m. but found she was not home, and so went to his cousin Larry's house. Michaels asked why defendant texted A to "come home" if he was no longer at the apartment. Michaels also told defendant that surveillance video showed his car parked in front of the apartment at that time. Defendant expressed surprise about the text messages and surveillance video, stating, "That's insane[.]" At various times throughout the interrogation, defendant asked to call his family, and each time the detectives told him that he could call his family once the interrogation was over.

Michaels continued describing evidence that defendant was present at the apartment at the time of the fire. Defendant insisted that he did not remember and did not know why the evidence showed that he was there. Michaels repeatedly said that J's and T's families deserved to know what happened, as did A, that they needed closure, and that defendant being honest about what he did would help them and defendant. At various points, Michaels said to defendant:

"I guess I am trying to emphasize to you that it would probably be actually good for you to kind of talk to me about what happened past this."

"But, you know, we are at the stage where it is basically about helping you through this. And helping the families through this."

"And sometimes, you know, if you really want to talk about how it helps you, if you look at it like this down the road.

And how people are going to view this. And how are they going to view [defendant].”

“But if you will, for this moment, step out of yourself a little bit and think about those other people. And it might help you even. And it will certainly help [the families].”

“[J’s and T’s] families deserve to know what happened. * * * And you are the person that can tell them. And I have been doing this long enough to know that even if—even if it is not something that you want to say. Even if it is something that feels terrible to you. It is still better to say it. And to let them hear it. Than not to. It’s better for them. And it’s better for you. Even though, alright, it—it’s a terrible thing. I mean, I get that it is horrible what happened. But somehow hearing about what happened and why, helps. I don’t know why. I’m not a psychologist. I just know that it’s true. It helps. And I like to help the families.”

The other detective, Luiz, also encouraged defendant to be honest. When Luiz asked about his text messages to A around the time of the fire, defendant said that, if he really did start the fire, then he needed to figure it out with a doctor because there was “something missing in [his] head.” Luiz told defendant that it was his chance to be honest and that a jury, the judge, the prosecutor, and the families would know if he was honest:

“And you know what they are going to see, is they are going to see [you]. And they are going to see [you] being honest. Or not being honest. And here is your opportunity to be honest. So they say, this guy made a really bad mistake. But he stood up for it. And he was honest about it.

“A jury is going to know that. The judge is going to know that. The prosecutor is going to know that. The family is going to know that.

“But it’s all about honesty at this point. Nobody is going to believe that you didn’t remember that event. Nobody. I don’t believe it. [Michaels] doesn’t believe it.”

Defendant asked to speak with Michaels alone. Defendant then admitted to getting a gas can from his car and pouring a small amount of gasoline on the couch. He admitted to leaving the gas can on the couch, going to the front door, and lighting a cigarette. Defendant said that the

cigarette lighter must have ignited the gasoline fumes. He said that he never intended to start a fire and only wanted to set it up "like a scene" for A to see the couch covered in gasoline when she got home. Michaels told defendant that it was impossible for the couch to ignite by lighting a cigarette from that distance. Defendant maintained that he did not intentionally light the couch on fire.

After about four hours, the interrogation ended.

Defendant was charged with numerous crimes relating to the fire. Before trial, he moved to suppress his statements to the police as not voluntary under Article I, section 12, of the Oregon Constitution and ORS 136.425. The court held a hearing, at which witnesses testified and the interrogation video was shown.

The trial court concluded that the state had met its burden to prove that defendant's statements were voluntary. The court noted that defendant was taken to the hospital as a precaution but discharged when nothing was found to be wrong with him, then given an opportunity to sleep, and that he was not interviewed until "many, many hours" later. During the interview, as described by Michaels and shown on the video, defendant did not exhibit any signs of intoxication or of psychological suffering beyond what one would expect in a murder interrogation. Defendant was struggling and upset about his life circumstances and relationships, but Michaels remained calm. She "was very calm, patient," "super empathic," and "sort of utilizing reflective listening," and never "really turned up the heat at all" or "did anything other than talk to him in a calm way." Even adjurations were made in a "sort of calm, non-pressing way." The detectives also accommodated defendant when he asked for water or a break.

The trial court explained that "mere adjurations" do not normally render a confession involuntary, nor do statements regarding the "natural consequences of not owning up and accepting responsibility." Given the lack of threats or inducements, as well as the totality of the circumstances, the court concluded that the state had met its burden of proving that the statements were voluntary.

The case proceeded to trial. Defendant was found guilty and convicted of two counts of first-degree manslaughter, ORS 163.118 (Counts 1 and 2); two counts of second-degree murder based on felony murder, ORS 163.115 (Counts 8 and 9); four counts of first-degree aggravated animal abuse, ORS 167.322 (Counts 12, 13, 14, and 15); and one count of fourth-degree assault constituting domestic violence, ORS 163.160(2) (Count 16). Additional guilty verdicts for first-degree arson (Counts 3, 4, and 5), second-degree murder (Counts 6 and 7), and first-degree manslaughter (Counts 10 and 11) merged into the stated convictions. Defendant appeals.

## MOTION TO SUPPRESS

We begin with defendant's motion to suppress. ORS 136.425(1) provides that "[a] confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats." Article I, section 12, of the Oregon Constitution provides that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself." Together, Article I, section 12, and ORS 136.425(1) "embod[y] the common-law rule that confessions made by a defendant in custody that were induced by the influence of hope or fear, *** are inadmissible against the defendant." *State v. Simmons*, 302 Or App 133, 137, 460 P3d 521 (2020) (internal quotation marks omitted).

Defendant contends that the state failed to prove that his admissions were voluntary. He argues that the detectives improperly induced him to confess by conveying "the idea of a practical legal benefit should he confess, and the threat that if he did not, he would be facing aggravated-murder charges with no future opportunity to mitigate his predicament." The state disagrees. It counters that the detectives did not provide any improper inducements and that, in the totality of the circumstances, the admissions were proved to be voluntary. The state emphasizes that "mere adjurations" to tell the truth are generally permissible, so long as they are not accompanied by a threat or a promise, including adjurations to tell the truth to relieve

the defendant's own conscience or to ease a victim's family's suffering. *State v. Jackson*, 364 Or 1, 24-25, 430 P3d 1067 (2018).

We review the denial of a motion to suppress for legal error. *Simmons*, 302 Or App at 137. In doing so, we are bound by the trial court's explicit and implicit factual findings if evidence in the record supports them. *Id*. Whether a confession is voluntary is a question of law. *Jackson*, 364 Or at 21. Confessions are presumed to be involuntary, and the state bears the burden of proving voluntariness. *Id*. Ultimately, the question is "whether the state met its burden to prove that defendant's free will was not overborne and his capacity for self-determination was not critically impaired, and that he made his statements without inducement from fear or promises." *Id*. at 22. In answering that question, "we must look to the totality of the circumstances," but it is "helpful to begin with the issue of whether the officers who interrogated defendant induced him to make admissions by the influence of hope or fear." *Id*.

Defendant points to several statements by the detectives that he contends were improper inducements: (1) "it would probably be actually good for you to kind of talk to me about what happened"; (2) "we are at the stage where it is basically about helping you through this"; (3) "it would be a good idea for you to help yourself and ease some of this"; (4) it "helps you, if you look at it like this down the road [a]nd how people are going to view this"; (5) it "might help you even"; (6) "it's better for you"; (7) it is an "opportunity to be honest" and a jury, the judge, the prosecutor, and the families will know that "he was honest about it."

We are unpersuaded that those statements were improper so as to induce a confession from fear or promises. *See id*. at 24 ("[A]n impermissible inducement is one that conveys to a defendant the idea of a threat or promise.").

The first six statements were mere adjurations to tell the truth to relieve defendant's own conscience, to give A some closure, and to ease the suffering of T's and J's families. *See id*. (describing prior case law upholding confessions "where defendants had been told, as a general matter, that

it would better if they told the truth, or that they would feel better if they told the truth," without attendant threats or promises). Like the statements found permissible in *Jackson*, they embodied the themes of "relieving defendant's conscience and easing the suffering of the victims' families." *Id.* at 25; *see also State v. Pryor*, 309 Or App 12, 20, 481 P3d 340, *rev den*, 368 Or 511 (2021) (telling the defendant that confessing would help him conveyed the detective's experience that "people who confessed were the ones who were able to get help," rather than promising help *in exchange* for a confession).

The seventh statement—that defendant had an "opportunity to be honest" and that, in the future, a jury, the judge, the prosecutor, and the families would know that he was honest—is different, in that it refers to the legal process ahead, and requires closer consideration. Ultimately, however, that statement is not improper either, because it refers to the natural consequences of defendant's decision whether to confess—*i.e.*, how people will perceive him if he admits what he has done versus lying about it—rather than promising anything. *See Jackson*, 364 Or at 27 (distinguishing between detectives describing the "natural consequence[s]" of refusing to cooperate, which is permissible, and their telling a suspect that they will actively make things "as bad as possible for him" if he does not confess, which is improper (internal quotation marks omitted)); *State v. Linn*, 179 Or 499, 513, 173 P2d 305 (1946) (concluding that the defendant's confession was improperly induced, where the detectives told him that if he "did it 'the hard way' they would fight him to the last inch" and subtly promised leniency, instead of official hostility, if he admitted to the crime).

The detectives did not imply that defendant could avoid prosecution by confessing, nor did their statements carry a promise of leniency in exchange for a confession. *Compare State v. Chavez-Meza*, 301 Or App 373, 389, 456 P3d 322 (2019), *rev den*, 366 Or 493 (2020) ("Although the statements imply that it ultimately would be better for defendant to present his side of the matter to refute the victim's account, we do not view the detectives' statements as an implied promise of immunity or leniency from the district

attorney or court."), *and State v. Didlot*, 322 Or App 662, 678, 521 P3d 159 (2022), *rev den*, 370 Or 822 (2023) (holding that detectives telling the defendant that confessing would "help" him was a generic enough statement that it was not an improper inducement), *with State v. Rodriguez-Aquino*, 311 Or App 519, 535, 489 P3d 1060 (2021) (holding that detectives implying that a confession would "help" defendant was an improper inducement where they "suggested that DHS involvement might be an alternative path to prosecution"). Thus, although the seventh statement requires closer scrutiny than the others, it too was not an improper inducement.

We next consider the totality of the circumstances. *Jackson*, 364 Or at 21. In assessing the totality of the circumstances as relevant to voluntariness, we look to a defendant's personal characteristics, the detectives' method of interrogation, the location and length of the interrogation, and whether defendant was given breaks. *Id.* at 27-28; *Pryor*, 309 Or App at 21. It is also significant as part of the totality of the circumstances whether the defendant was given *Miranda* warnings before making the incriminating statements. *Jackson*, 364 Or at 26 ("the fact that defendant was given *Miranda* warnings is an important factor in an analysis of whether—under the totality of the circumstances—defendant's will was overborne," whereas that fact is less significant when the interrogators make impermissible inducements).

Defendant argues that the state failed to prove that his admissions were voluntary under the totality of the circumstances. Specifically, he argues that the detectives implied that the interrogation was his last chance to mitigate the charges, told him that he could not call his family until the interrogation was over, interrogated him for over four hours, and used the Reid technique on him. *See Jackson*, 364 Or at 29 (the "Reid technique" is a common interrogation technique that "involves isolating a suspect in a small room to increase anxiety; confronting the suspect with accusations of guilt and emphasizing the strength of the evidence against the suspect; offering sympathy and justifications or rationalizations to allow the suspect to minimize the crime; and encouraging the suspect to see confession as a means of terminating the interview"). He further

argues that he has a "borderline to low average" IQ, that he had been released from the hospital the night before, and that he expressed that he was feeling sick and unable to breathe during the interview.

The trial court found that defendant was "struggling" and "upset" about his personal circumstances at times during the interrogation, but that nothing was found to be wrong with him at the hospital, that he had the opportunity to sleep before the interview, that he showed no signs of intoxication, and that he was not psychologically suffering more than one would expect of any person being interrogated for murder. The court further found that Michaels was very calm, patient, and empathic throughout the interview, engaged in reflective listening, and never "really turned up the heat at all" and that defendant's request to speak to Michaels alone demonstrated that he was comfortable with her. The detectives also accommodated defendant's requests for water or a break.

Given those findings and the record as a whole, we conclude that the state met its burden to show that defendant's will was not overborne and that his admissions were voluntary. Defendant was given *Miranda* warnings at the beginning of the interrogation. The detectives' questions were certainly direct and aimed at getting defendant to admit to starting the fire, but there was no badgering or aggressiveness, and Michaels, who handled most of the questioning, was particularly calm and empathic in her approach. *See Pryor*, 309 Or App at 23 (describing the interrogating detectives' questions as "direct," "open-ended," and "low-key" and not remotely "badgering"). The interrogation was long, nearly four hours, which is a "duration that often cuts against a determination of voluntariness," but, as in *Pryor*, the detectives accommodated defendant's requests for breaks and water. *See id.* at 23-24 ("Defendant's requests for breaks—of which he took four, each lasting from nine to 14 minutes—were immediately honored."). Lastly, although defendant expressed feeling sick and like he could not breathe at times, the evidence supports the trial court's finding that he was not "suffering psychologically more" than anyone subject to a murder investigation would. "[T]he fact that an interrogation is physically and mentally demanding

does not necessarily make the admissions that are adduced involuntary and inadmissible." *Jackson*, 364 Or at 31.

In sum, the state met its burden to establish that defendant's admissions were voluntary, and the trial court did not err in denying suppression.

## FELONY MURDER

Defendant next assigns error to the denial of his demurrer to the amended indictment on federal due process grounds.

In Counts 8 and 9, defendant was charged with second-degree murder on a felony-murder theory, ORS 163.115(1)(b). In words tracking the statutory language, he was alleged to have committed and attempted to commit the crime of first-degree arson "and in the course of and in the furtherance of and in immediate flight from said crime" to have "cause[d] the death of * * * another human being, who was not a participant in the crime[.]" *See* ORS 163.115(1)(b) (defining second-degree murder to include "criminal homicide * * * [w]hen it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the [specified] crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants"); ORS 163.115(1)(b)(A) (identifying first-degree arson as one of the specified crimes).[1] Count 8 pertained to T's death, and Count 9 pertained to J's death. Defendant was not alleged in those counts to have had any culpable mental state with respect to the causation of death.

Defendant unsuccessfully demurred to the felony-murder counts on federal due process grounds. He reprises the same arguments on appeal. Defendant contends that ORS 163.115(1)(b) improperly "requires a factfinder to presume a culpable mental state with regards to the causation

---

[1] The other crimes to which the felony-murder statute applies are first-degree criminal mischief, first-degree burglary, first-degree escape, first- and second-degree kidnapping, first-degree robbery, any first-degree sexual offense, compelling prostitution, and first-degree assault. ORS 163.115(1)(b)(B) - (J).

of death," which "is inconsistent with the presumption of innocence, relieves the state of its burden to prove every element of the offense, and invades the province of the jury." Alternatively, defendant argues that, if felony murder is a strict-liability offense that does not require proof of a culpable mental state as to the causation of death, then the statute violates due process by "dispensing with a mental state element for a violent felony criminal offense." The state responds that ORS 163.115(1)(b) does not violate due process, regardless of whether it is or is not a strict liability offense—a point on which the state takes no position—because many other states have rejected similar constitutional challenges to their own felony-murder statutes.

As we will explain, we ultimately conclude that ORS 163.115(1)(b) does not violate due process. We understand *State v. Blair*, 348 Or 72, 228 P3d 564 (2010), to construe ORS 163.115(1)(b) as a strict liability statute, even though *Blair* does not use those exact words, and we disagree with defendant that it violates due process to impose strict liability for deaths caused in the commission of a dangerous felony. We reject defendant's due process argument on that basis.

The felony-murder rule originates in the common law, has existed in the Oregon statutes since 1864, and is currently codified as ORS 163.115(1)(b). *See State v. Reams*, 292 Or 1, 5, 636 P2d 913 (1981) (statutory history); Jens David Ohlin, 2 *Wharton's Criminal Law* § 21:9 (16th ed 2024) (common-law history). This case appears to present the first due-process challenge to Oregon's felony-murder statute, but other types of constitutional challenges have been raised— and have failed—over the years. *See, e.g.*, *State v. Reynolds*, 289 Or 533, 537, 614 P2d 1158 (1980) (rejecting an equal protection challenge based on the different punishments for aggravated murder and felony murder); *State v. Sparklin*, 61 Or App 608, 611, 658 P2d 571, *aff'd on other grounds*, 296 Or 85, 672 P2d 1182 (1983) (rejecting a disproportionality challenge based on the lesser *mens rea* requirement for felony murder relative to intentional murder).

Nationally, notwithstanding its critics and intermittent constitutional challenges, felony murder remains a crime in nearly every state. *Felony-murder*, 40 Am Jur 2d

*Homicide* § 60 (2024). Indeed, nearly 50 years ago, a plurality of the United States Supreme Court expressed the view that the authority of the states "to enact felony-murder statutes is beyond constitutional challenge." *Lockett v. Ohio*, 438 US 586, 602, 98 S Ct 2954, 57 L Ed 2d 973 (1978); *see also, e.g.*, *State v. Ortega*, 112 NM 554, 559, 817 P2d 1196 (1991) ("Few legal doctrines have been as maligned and yet have shown as great a resiliency as the felony-murder rule.").

The question before us, however, is not the legislature's authority in the abstract to enact a hypothetical felony-murder statute that does not violate due process. Rather, we must assess whether Oregon's actual felony-murder statute, ORS 163.115(1)(b), violates due process. That question turns out to be somewhat complicated, particularly given how the statute was construed in *Blair*.

Because it is pivotal to our analysis, we begin with *Blair*. The defendant in *Blair* broke into a house to steal marijuana plants and, in the course of committing the burglary, attempted to rape and sexually abuse the woman who lived there, then left her tied her to a bedpost. 348 Or at 74. After the defendant left, the woman died from chronic obstructive pulmonary disease that was "exacerbated critically by the burglary, attempted rape, and attempted sexual abuse." *Id*. The state charged the defendant with first-degree burglary and felony murder. *Id*. at 75. The defendant filed a pretrial demurrer to the felony-murder charge, arguing that the indictment was legally flawed in that it failed to allege a culpable mental state as to causation of death. *Id*. at 74. In the defendant's view, because felony murder is a form of "criminal homicide," the state was required to allege and prove that he had "caused the death of the victim with a culpable mental state" of at least criminal negligence. *Id*. The trial court overruled the demurrer. *Id*. at 74-75. The case proceeded to trial, and, at trial, the defendant requested a jury instruction that would have required the jury to find that he acted with at least criminal negligence in causing the victim's death, in order to find him guilty of felony murder. *Id*. at 75. The court declined to give that instruction. *Id*.

On appeal, we held that the trial court did not err, and the Supreme Court agreed. *Id*. The Supreme Court

framed the issue on review as "whether the definition of criminal homicide in ORS 163.005(1) applies to felony murder, as codified in ORS 163.115(1)(b), in such a way that felony murder in Oregon requires the state to allege and prove that a defendant acted with a mental state in causing the victim's death distinct from any mental state required to prove the underlying felony." *Id*. at 75. The court answered that question in the negative, *id*. at 80, reasoning as follows.

The court agreed with the defendant that felony murder is a form of "criminal homicide," *id*., "a new offense created during the 1971 revision" of the Oregon Criminal Code that "had no preexisting history in Oregon law," *id*. at 77. It also agreed with the defendant that, because felony murder is a form of criminal homicide, it is subject to ORS 163.005(1), which states that "'[a] person commits criminal homicide if, without justification or excuse, the person intentionally, knowingly, recklessly or with criminal negligence causes the death of another human being.'" *Id*. at 76, 80. The court disagreed with the defendant, however, that it followed that the state had to allege and prove that he had a culpable mental state as to causing the victim's death. *Id*. at 80.

The court explained that "the felony murder rule was first codified in Oregon in 1864" and "remained substantially unchanged until the criminal code revisions in 1971." *Id*. at 77-78. Historically, the court had "consistently incorporated an 'implied malice' rule into felony murder," such that "felony murder contain[ed] no distinct or independent *mens rea* requirement in relation to the cause of death of the victim." *Id*. at 78 (citing case law from 1879, 1939, and 1966); *see, e.g.*, *State of Oregon v. Brown*, 7 Or 186, 198, 204 (1879) ("The indictment having alleged the killing in the perpetration of a robbery, it is only required that the robbery and the killing, in the manner alleged, during the robbery, be proven to make out the case. In such a case, and under such proof, the intent to kill and the deliberate and premeditated malice are incontrovertibly implied.").

Nothing in the text, context, or legislative history of ORS 163.115(1)(b) indicated to the *Blair* court that the 1971 legislature intended to change that longstanding rule. *Blair*, 348 Or at 79-80. To the contrary, the court found that "other

aspects of the statutory scheme demonstrate that the legislature intended to retain the felony murder rule in its traditional form," *id.* at 79, and that "much [of] the legislative history suggests that the legislature intended to adhere to" the longstanding rule regarding implied malice, *id.* at 80. That led the court to conclude that, with respect to felony murder, the legislature intended the requisite mental state for the underlying felony to continue "to be imputed as a matter of law to the cause of the death of the victim," *id.* at 80, rather than intending to require a new "distinct or independent *mens rea* with respect to the cause of the victim's death," *id.* at 78. Accordingly, the court held in *Blair* that the "requisite culpable *mens rea*" under ORS 163.115(1)(b) "is established, as a matter of law, by the defendant's commission or attempted commission of the predicate felony." *Id.* at 80.

The question before us now is the due process ramifications of that holding. That is, does ORS 163.115(1)(b) as construed in *Blair* violate due process by creating a conclusive presumption as to a required element of the crime? Defendant argues that it does, relying on *Sandstrom v. Montana*, 442 US 510, 99 S Ct 2450, 61 L Ed 2d 39 (1979).

In *Sandstrom*, the petitioner was charged with "deliberate homicide" under Montana law, a crime that required him to have "purposely or knowingly" caused the victim's death. *Id.* at 512. The petitioner admitted at trial to causing the victim's death but argued that he did not do so "purposely or knowingly" and therefore should be found guilty of a lesser offense. *Id.* At the state's request, the court instructed the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 513. The petitioner was found guilty of deliberate homicide. *Id.*

The United States Supreme Court reversed the conviction, holding that the jury instruction violated federal due process because it "had the effect of relieving the State of the burden of proof *** on the critical question of petitioner's state of mind." *Id.* at 521. The Court explained that, if the instruction was understood to create a "conclusive presumption" on the intent element—as the petitioner argued—then it violated due process because it "conflict[ed] with the overriding presumption of innocence with which

the law endows the accused and which extends to every element of the crime," as well as "invad[ing] the factfinding function which in a criminal case the law assigns solely to the jury." *Id*. at 523 (internal quotation marks and brackets omitted). Conversely, if the instruction was understood not to create a conclusive presumption but instead only to shift the burden of persuasion to the petitioner to prove that he lacked the requisite mental state—as the state argued— then it violated due process by impermissibly shifting the burden of proof on an element of the offense. *Id*. at 524.

Notably, the principle from *Sandstrom* applies even to legislatively created presumptions. For example, in *Carella v. California*, 491 US 263, 264, 109 S Ct 2419, 105 L Ed 2d 218 (1989), the trial court instructed the jury in a criminal case in accordance with certain "statutory presumptions" under state law—specifically that a person is "presumed" to have the intent to commit theft by fraud in certain circumstances (per the California penal code) and is "presumed" to have committed embezzlement in certain circumstances (per the California vehicle code). The United State Supreme Court held that those jury instructions violated federal due process under *Sandstrom* and related case law, because they "directly foreclosed independent jury consideration of whether the facts proved established certain elements of the [charged] offenses" and "also relieved the State of its burden of * * * proving by evidence every essential element of" the crimes. *Id*. at 266.

Relying on *Sandstrom*, defendant argues that ORS 163.115(1)(b) violates federal due process because, as construed in *Blair*, it carries a conclusive presumption that the defendant had a culpable mental state as to causing the victim's death. In other words, as defendant sees it, the *Blair* court had no choice but to construe ORS 163.115(1)(b) as requiring a culpable mental state for causation of death, given the 1971 legislature's decision to make felony murder a form of "criminal homicide," but then recognized a conclusive presumption for that element to avoid the state having to actually prove it, which violates federal due process under *Sandstrom*.

On its face, *Blair* is susceptible to defendant's reading. *Blair* acknowledges that felony murder is a form of "criminal

homicide" and therefore requires a culpable mental state as to the causation of death. 348 Or at 80 (concluding that "(1) under ORS 163.005(1), 'criminal homicide' requires that a defendant act with a culpable *mens rea* with respect to causing the victim's death" and "(2) under ORS 163.005(2), 'criminal homicide' includes 'murder'"). *Blair* then holds that the state is not required to "allege" or "prove" a culpable mental state as to causation of death, because the "requisite culpable *mens rea*" is "imputed as a matter of law" and "established, as a matter of law, by the defendant's commission or attempted commission of the predicate felony." *Id*. at 80; *see also id*. at 74 ("[T]he felony murder statute, ORS 163.115(1)(b), does not require that the state allege and prove that a defendant acted with a culpable mental state in causing the victim's death; rather, the defendant's commission or attempted commission of the underlying felony establishes, as a matter of law, the requisite *mens rea* with respect to the victim's death.").

We recognize that the reasoning and language of *Blair* send up red flags under *Sandstrom*. At the same time, we try to avoid reading Supreme Court decisions to stand for absurd propositions, and it would be absurd to read *Blair* as holding that there is an element of felony murder—a culpable mental state with respect to causation of death—that the state need not allege or prove. If something need not even be alleged, then it cannot be understood as an element of the offense. Consequently, the more plausible reading of *Blair* is that it construes ORS 163.115(1)(b) to create a strict liability offense. That is, under ORS 163.115(1)(b), a person who commits or attempts to commit any of a list of dangerous felonies is strictly liable if another person (other than a co-participant) dies in connection with that felony.

We recognize that *Blair* does not use the term "strict liability." We also recognize that *Blair* starts from the premise that felony murder, as a species of criminal homicide, requires a culpable mental state as to the causation of death. *See Blair*, 348 Or at 80. At the same time, *Blair* unequivocally holds that there is no "distinct or independent *mens rea* with respect to the cause of the victim's death," *id*. at 78, 80, which essentially amounts to felony murder not requiring a culpable mental state as to causation of death.

The court's holding that the state need not even *allege* a culpable mental state as to causation of death is especially telling. If the state had to allege a culpable mental state as to causation of death, then it would also have to prove it, and allowing the state to prove it with a presumption instead of evidence would violate due process under *Sandstrom*. But when it need not even be *alleged*, let alone proved, it cannot be understood as an element of the offense.

The only logical conclusion is that felony murder under ORS 163.115(1)(b) as construed in *Blair* is a strict liability offense.[2] It therefore does not violate due process by imposing an impermissible presumption within the meaning of *Sandstrom*. *Cf. State v. Patterson*, 311 Kan 59, 64-68, 455 P3d 792 (2020) (collecting cases; explaining that some courts have held that their felony-murder statutes do not violate due process because intent to kill is not an element of the crime, while others have held that the presumption of malice is a rule of law and not a true presumption; and holding that Kansas's felony-murder statute "does not operate as an unconstitutional, conclusive presumption that invades the jury's province" because "intent to kill is not an element of felony murder" under Kansas law).

That brings us to defendant's alternative argument: that, if ORS 163.115(1)(b) imposes strict liability for causing another person's death in the course of committing a dangerous felony—as we have explained that it does—then it violates due process by "dispensing with a mental state element for a violent felony criminal offense." In defendant's view, it violates federal due process to convict someone of a "violent

---

[2] At least one of the drafters of the 1971 Oregon Criminal Code, Professor George M. Platt, expressly described the new felony-murder statute as creating "strict liability" for death caused in the commission of a qualifying felony, while explaining why he supported adding the affirmative defense now codified as ORS 163.115(3). *See* Tape Recording, Criminal Law Revision Commission, Subcommittee No. 2, Nov 14, 1969, Tape 87, Side 1 (statement of Professor George M. Platt, University of Oregon School of Law) ("[W]e have approached the outer limits of the *mens rea* requirements with respect to murder in the felony-murder doctrine. *In effect what we have is strict liability when one who sets out to commit a lesser felony with no* mens rea—*with no mental element of intending to kill anyone—winds up as a murderer.* Now that in most cases will still continue to be the case because of the way we've got it drafted but there will be a door through which the very unusual defendant will be able to exit from the charge of murder." (Emphasis added.)); *see State v. Blair*, 230 Or App 36, 55, 214 P3d 47 (2009), *aff'd*, 348 Or 72, 228 P3d 564 (2010) (quoting that legislative history).

felony criminal offense" like second-degree murder, which carries heavy criminal penalties, without requiring a culpable mental state. Defendant argues that strict liability should be limited to regulatory or public welfare offenses with minor penalties, citing *Rehaif v. United States*, 588 US 225, 232, 139 S Ct 2191, 204 L Ed 2d 594 (2019) ("We have sometimes declined to read a scienter requirement into criminal statutes. But we have typically declined to apply the presumption in favor of scienter in cases involving statutory provisions that form part of a 'regulatory' or 'public welfare' program and carry only minor penalties." (Internal citation omitted.)).

The state responds that there is nothing unconstitutional about felony murder being a strict liability crime. The state points to case law from other jurisdictions upholding strict-liability felony-murder statutes against due process challenges. *See, e.g.*, *People v. Benson*, 125 Misc 2d 843, 846, 480 NYS2d 811 (1984) ("All the courts which have addressed this issue have ruled that the lack of the element of intent does not violate due process of law."); *Brown v. State*, 448 NE 2d 10, 15 (Ind 1983) (rejecting a due process challenge to felony murder where the "[a]ppellant cite[d] no authority for the proposition that because, under the felony murder theory, there is no need to prove a specific intent to kill, the statute is unconstitutional"); *see also People v. Root*, 524 F2d 195, 197 (9th Cir 1975), *cert den*, 423 US 1076 (1976) ("Nothing in the United States Constitution deprives legislatures of the power to impose upon those who kill their victims in the course of inherently dangerous felonies the same sanctions they choose for those who kill their victims after meditation sufficient to satisfy the jurisdiction's definition of first-degree murder."). The state also notes that there exists an affirmative defense to felony murder, which the state views as lessening due process concerns.[3] *See* ORS

---

[3] We do not ourselves rely on the affirmative defense in ORS 163.115(3) in concluding that the felony-murder statute does not violate federal due process. Because a culpable mental state as to causation of death is not an element of the offense (as we understand *Blair*), the affirmative defense does not create a risk of burden-shifting on an element of the offense. *See Sandstrom*, 442 US at 524 (holding that it violates due process to shift the burden of proof on an element of a criminal offense to the defendant). However, it does not necessarily follow that the existence of the affirmative defense should favor the state in a due-process analysis of felony murder as a strict liability offense. The state has not cited any

163.115(3) (providing for an affirmative defense to felony murder where five specific facts are proved).

We disagree with defendant that, because felony murder is a serious crime with serious consequences, it necessarily violates federal due process to hold a person strictly liable for a death that occurs during the commission of a dangerous felony. The felony murder rule originated in the common law nearly four centuries ago, Jens David Ohlin, 2 *Wharton's Criminal Law* § 21:9 (16th ed 2024), and is codified in the statutes of nearly every state. A half-century ago, a plurality of the United States Supreme Court described the states' authority to enact felony-murder statutes as "beyond constitutional challenge," *Lockett*, 438 US at 602, and the Court has not called that statement into question in the intervening decades. As one court has put it, the "continued vitality" of felony-murder statutes is "a strong indicator of states' power to impose strict criminal liability." *State v. Maldonado*, 137 NJ 536, 549, 645 A2d 1165 (1994).

Moreover, our own Oregon Supreme Court has noted, "The Supreme Court of the United States, in applying the federal constitution, has generally refused to interfere with the historical state power to create strict liability crimes." *State v. Buttrey*, 293 Or 575, 587, 651 P2d 1075 (1982). And we ourselves have held that imposing strict liability for statutory rape, a felony that carries a five-year prison term, does not violate due process. *State v. Jalo*, 72 Or App 479, 482, 696 P2d 14, *rev den*, 299 Or 443 (1985) ("We agree with defendant that sexual intercourse with a person under 16 is normally a strict liability crime, but we hold that there is no constitutional infirmity in that fact." (Footnote omitted.)). We are unpersuaded that, by mere virtue of being a strict liability offense, felony murder under ORS 163.115(3) violates federal due process.

Affirmed.

---

authority on that point, and defendant is silent on it altogether. We need not reach that issue, so we express no opinion on it.